J-A27037-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| MICHELLE GRACE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| JAY H. KAUFMAN, D.P.M. | No. 574 EDA 2016 |

Appeal from the Judgment Entered March 16, 2016
in the Court of Common Pleas of Lehigh County Civil Division
at No(s): No. 2013-C-3626

BEFORE: PANELLA, LAZARUS, FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:  **FILED DECEMBER 14, 2016**

Appellant, Michelle Grace, appeals from the judgment entered in the Lehigh County Court of Common Pleas following the denial of her motion for post-trial relief. Appellant contends the court erred when it failed to grant a new trial based upon the absence of a *res ipsa loquitur* jury instruction. We affirm.

We adopt the facts as set forth in the trial court's opinion. *See* Trial Ct. Op., 2/1/16, at 2-8. Following the close of evidence, Appellant requested that the trial court give the jury a *res ipsa loquitur* instruction. R.R. at 894a.[1] The trial court denied the request. *Id.* at 897a. Appellant

---

[*] Former Justice specially assigned to the Superior Court.

[1] For the parties' convenience, we refer to the reproduced record where applicable.

filed a motion for post-trial relief. The trial court denied the motion for a new trial on February 1, 2016. Appellant filed a notice of appeal on February 16, 2016. A praecipe to enter judgment was filed on March 16, 2016. That same day, judgment was entered in favor of Appellees and against Appellant and Pa.R.C.P. 236 notice was mailed.[2] Appellant was not ordered to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The trial court's Pa.R.A.P. 1925(a) opinion incorporated the opinion attached to the February 1, 2016 order.

Appellant raises the following issues for our review:

> 1. Did the [t]rial [c]ourt err as a matter of law or otherwise abuse its discretion by failing to instruct the jury with respect to the doctrine of *res ipsa loquitur* when (1) the parties agreed that [Appellant's] injuries cannot occur during surgery in the absence of negligence, and (2) [Appellant's] experts testified unequivocally that the injuries occurred during surgery?
>
> 2. Did the [t]rial [c]ourt err as a matter of law or otherwise abuse its discretion when it failed to instruct the jury with respect to the doctrine of *res ipsa loquitur* notwithstanding [Appellant's] satisfaction of the requisite elements of the doctrine, because the expert testifying on behalf of the defense disputed that the injury occurred as a consequence of the surgery in question?
>
> 3. Did the [t]rial [c]ourt err when it refused to grant a new trial where the charge to the jury failed to include an

---

[2] Appellant's notice of appeal was premature because it was filed prior to the entry of judgment. We will deem the notice of appeal to have been timely filed from the entry of judgment. Pa.R.A.P. 905(a); **Johnston the Florist, Inc. v. TEDCO Constr. Corp.**, 657 A.2d 511, 514 (Pa. Super. 1995).

> instruction regarding the availability of the doctrine of *res ipsa loquitur*?

Appellant's Brief at 4-5.[3]

Appellant argues as follows:

> In this case, [Appellant] and her experts were unable to explain precisely how [Appellee] managed to injure her tendons. [Appellant] relied entirely upon circumstantial proof that [Appellee] had to have done something wrong during the surgery because there was no other explanation for the injuries. This factual scenario represents the classic setting for the invocation of *res ipsa loquitur*.

Appellant's Brief at 28. Appellant contends that the fact that Appellee introduced "contrary evidence" does not defeat Appellant's entitlement to a *res ipsa loquitur* instruction. **Id.** at 32. Appellant concludes that she is entitled to a new trial based upon the trial court's "failure to give such an instruction." **Id.** at 40. We find no relief is due.

"When presented with an appeal from the denial of a motion for a new trial, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." **MacNutt v. Temple Univ. Hosp., Inc.**, 932 A.2d 980, 984–85 (Pa. Super. 2007) (*en banc*) (quotation marks and citation omitted). "We will grant a new trial based on error in the court's charge if, upon considering all the evidence of record we determine that the jury was probably misled by the court's instructions or that an omission from the charge amounted to

---

[3] We address Appellant's issues together because they are interrelated.

fundamental error." ***Angelo v. Diamontoni***, 871 A.2d 1276, 1279 (Pa. Super. 2005) (quotation marks and citation omitted).

> *Res ipsa loquitur* allows juries to infer negligence from the circumstances surrounding the injury. *Res ipsa loquitur*, meaning literally "the thing speaks for itself," is "a shorthand expression for circumstantial proof of negligence-a rule of evidence." ***Gilbert v. Korvette, Inc.***, [ ] 327 A.2d 94, 99 ([Pa.] 1974). It is a rule that provides that a plaintiff may satisfy his burden of producing evidence of a defendant's negligence by proving that he has been injured by a casualty of a sort that normally would not have occurred in the absence of the defendant's negligence.

***Quinby v. Plumsteadville Family Practice, Inc.***, 907 A.2d 1061, 1071 (Pa. 2006).

Section 328D of the Restatement (Second) of Torts sets forth the following elements necessary to raise the inference of negligence:

> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
>
>> (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
>>
>> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and
>>
>> (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.
>
> (2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.
>
> (3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

Rest. (Second) Torts § 328D(1)-(3).

> **Before a plaintiff can invoke the doctrine of *res ipsa loquitur*, all three of the elements of Section 328D(1) must be established**; only then does the injurious event give rise to an inference of negligence. After all three elements have been established, if reasonable persons may reach different conclusion[s] regarding the negligence of the defendant, then it is for the jury to determine if the inference of negligence should be drawn. Significantly, if there is **any other cause** to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant.

*MacNutt*, 932 A.2d at 987 (quotation marks and citations omitted and emphasis added).

In *MacNutt*, the Court found "[t]he [experts'] difference of opinion on the nature of [the a]ppellant's injury as well as the competent evidence of another possible cause for the injury . . . created a factual dispute regarding whether [the a]ppellant's injury was outside the scope of [the a]ppellees' duty to Appellant." *Id.* at 991. Therefore, in that case this Court concluded that the appellant was not entitled to a *res ipsa loquitur* jury instruction. *Id.*

Instantly, the trial court opined:

> In this case, like *MacNutt*, an issue of fact regarding the nature of [Appellant's] injury as well as where/when the event actually took place was in dispute: was the injury severed tendons or spontaneously ruptured tendons; did the injury take place during the October 11, 2011, surgery or several weeks after surgery?
>
> \* \* \*

[W]e find [Appellant] did not provide sufficient evidence to support the conclusion that the negligence of [Appellee] more likely than not caused [her] injuries. We find in this instance that the probabilities of negligence or its absence were evenly divided, at best. Accordingly, [Appellant] failed to meet the first element required for the doctrine of *res ipsa loquitur*.

\* \* \*

Because we find no error was made in determining that the *res ipsa loquitur* instruction was not applicable in this case, we conclude [Appellant] is not entitled to a new trial based on that claim.

Trial Ct. Op. at 14, 16, 18.

At trial, Appellant's expert, Dr. Howard S. Shapiro, testified to the following:

[Appellant's Counsel]: What are the tendons that run through the bottom of the foot?

A: So you have the flexors—the flexor tendons. You have the flexor halluces longus. The flexor digitorum longus.

Q: And so you've got the extensor tendons that bring the toes up you said. So what do the—the tendons that run on the bottom of the foot, what do they do?

A: They're going to bring the toes down.

Q: . . . The surgery in this case was called an arthroscopy with an ankle stabilization, this Bronstrom procedure.

\* \* \*

Q: [W]hat is the purpose of the arthroscopy?

A: The arthroscopy is to clean out the joint. Whether it's arthritic—for arthritic purposes.

\* \* \*

- 6 -

Q: [E]xplain to the members of the jury exactly how this procedure is done?

A: So it's done with very minimal incision—type surgery. You make a very small, little incision along the kind of front and inside portion of the ankle. And then from that point, you're inserting a camera into the joint capsule, into the joint. And kind of visualizing the joint under kind of like a microscope. So it kind of blows it up for you so you can see it very well.

And then you make another little portal, which is probably about a half a centimeter along the front but outside portion of the ankle. And that's where you're going to insert your tools for cleaning the ankle. And then basically everything is done through this minimal incision. So you're making very—two very small holes, and you're able to gain access to the ankle to clean it out thoroughly.

Q: So in this case, the holes—the two holes that are made in the ankle, are they—whereabouts are they? On the front of the ankle? . . .

A: Yeah, so they're on the front. But they're placed so they're away from any type of, I guess, important neurovascular tendons and structures.

\* \* \*

Q: [W]hat was the other procedure that he did?

A: The Brostrom.

Q: . . . Can you explain to the jury, first of all, why he was doing that procedure?

A: [Appellant] was diagnosed . . . with ankle instability. . . . So the purpose of the surgery was to repair the ligament to stabilize the ankle.

Q: . . . Tell the members of the jury what a ligament is?

A: A ligament is a thick bank of fibrous tissue or collagen that connects bone to bone.

R.R. at 586a-588a.

Dr. Shapiro testified that based upon Appellee's office notes of August 19, 2011 and the MRI, Appellant's extensor halluces longus ("EHL") and extensor digitorum longus ("EDL") were normal prior to surgery. ***Id.*** at 589a. Appellee's note of November 2, 2011, stated that there was no cellulitis or dehiscence. ***Id.*** at 591a.

> Q: [W]hat does it mean to have no cellulitis or dehiscence?
>
> A: There's no redness of the foot. Cellulitis is basically the skin or soft tissue infection. You would usually represent that by, you know, redness, warmth of the foot. And then as far as the—
>
> Q: Dehiscence?
>
> A: So there's no dehiscence. It means that the wounds that were created surgically are healing well and are together.
>
> Q: Then he says here weakness of extensors noted to lesser toes and able to dorsiflex foot. First of all, weakness of extensors, is that significant to you?
>
> A: Yes.
>
> Q: And what's the significance of that to you?
>
> A: That there's an issue going on. That she should be able to move her toes. I can't see any reason why they would be weak.

***Id.***

Appellee's office notes from Appellant's November 7th visit indicated "weakness of extensors appreciated to lesser toes, able to dorsiflex foot.

Ankle appears stable clinically." ***Id.*** Dr. Shapiro offered his opinion in the following exchange.

> Q: . . . Why was she having weakness of her extension in her toes on November 2nd, November 7th, November 9th, and so on?
>
> A: She had damage to her tendons from surgery.
>
> Q: Is that your opinion to a reasonable degree of medical certainty?
>
> A: Absolutely.
>
> \* \* \*
>
> Q: . . . So tell the members of the jury what this MRI of January 2012 showed?
>
> A: So it showed that there was a—a transection or a gapping between the tendon—the EHL tendon and the EDL tendon . . . . That they were separated or cut.
>
> \* \* \*
>
> Q: Do you have an opinion to a reasonable degree of medical certainty as to when and how those tendons were injured?
>
> A: Sure. At the time of surgery during the arthroscopy procedure.
>
> Q: . . . There was some talk . . . that these two tendons just spontaneously ruptured. Can you tell the jury whether in your opinion to a reasonable degree of medical certainty there is any—any scientific or medical basis for such a contention?
>
> A: Zero. These tendons do not spontaneously rupture.
>
> \* \* \*

Q: Now, other than [the] surgery [performed by Appellee], is there anything else that reasonably explains this injury?

A: No, there's not.

*Id.* at 592a-593a.

Appellee's expert, Dr. Allen Mark Jacobs, testified to the following:

I went back and looked at the two MRI's that were done after surgery. There was one that was done that [Appellee] ordered on January 28th. And there was one that Dr. Ruht ordered February 1st[.] And there's no evidence, whatsoever, at all of any injury. This is the MRI's. They show zero damage of any of those structures. It doesn't show any damage to that ankle joint. It doesn't show any damage to the soft tissues. It shows two ruptured tendons which were thickened and had increased signal in them because they had a condition called tendinosis.

. . . [I]t came down to one thing. The MRI's. We got pictures of her ankle after surgery and they show absolutely no evidence. None. None. That that arthroscopic shaver ever left that joint. None. Because it would have left a track. The MRI was done 90 days after that injury; and you're not going to heal perfectly in 90 days. But if you have so much damage that you slice through the ankle, slice through a nerve, artery and two veins, slice through two tendons. And the two tendons are apart. So [Appellee] would have had to also have done it in two separate areas, all the time keeping the arthroscopic shaver perfectly aligned. . . . And I say it's impossible.

\* \* \*

What we do have on the MRI is tendinosis. So we do know her tendons were diseased and predisposed to rupture. That we do know. And I think you're going to find, as you go through this, the evidence clearly shows that's what happened here.

\* \* \*

Q: Doctor, as far as the tendinosis is concerned, can that lead to a spontaneous rupture?

A: It is probably the most common cause of spontaneous rupture that we see and that I treat.

*   *   *

Q: Doctor, do you have an opinion as to whether [Appellee] was negligent in the performance of the arthroscopic procedure on October the 11th, 2011?

A: . . . I have no reason or no basis for me to think that he was in any way negligent.

Q: Do you hold that opinion to a reasonable degree of medical certainty?

A: Yes.

R.R. at 696a-697a, 705a-706a.

Dr. Gregory Schwartzman testified that he has expertise in the radiology of orthopedics. R.R. at 902a. He reviewed MRI studies from June 28, 2010, January 20, 2012, and February 1, 2012. *Id.*

[Appellee's Counsel]: [D]id you formulate an opinion with regard to whether [Appellee] during his operation of October 11th, 2011, cut those tendons of the EHL and the EDL? Did you formulate an opinion in that regard?

A: Yes, I did.

Q: [W]hat is your opinion?

A: That he did not cut those tendons.

Q: And do you hold that opinion to a reasonable degree of medical certainty?

A: Yes, I do.

- 11 -

*Id.*

Dr. Schwartzman, Appellee's expert, testified as follows regarding the January 20, 2012 MRI:

> Q: . . . And how do they appear to you with your expertise in radiology, those tendons?
>
> A:[T]here's tendon disease here.
>
> Q: . . . And tendon disease is known as what?
>
> A: There's a lot of words for it. Tendinopathy. Tendinosis.
>
>         \*     \*     \*
>
> Tendinosis is an abnormal tendon. When a tendon gets diseased, there's not many things that a tendon can do. So a tendon starts out as a dark cord. And as it gets diseased, what happens on the MRI is it thickens and gets brighter. It sort of degenerates internally. And different tissues come in and sort of degenerate it over time. Then you can go on to partial tearing. Then you can go up to full thickness tearing.
>
> Q: . . . Is tendinosis a precursor to any problem with a tendon?
>
> A: Yes, that's how a tendon develops its problems. It becomes tendonotic before it goes on to rupture.
>
> Q: Goes on to rupture?
>
> A: Yes.
>
> Q: . . . And is it a—can this process that we're talking about, going on to rupture, can it happen all of a sudden or is it a process that takes place in your experience?
>
> A: It's a process that takes place. A tendon needs to be diseased in order for it to rupture. And it can happen in a

short period of time; it can happen over a long period of time.

* * *

Q: [W]ith regard to the metal debris issue, did you find it in other parts of the body—other parts of the foot and ankle in your review of the MRI of January 20, 2012?

A: . . . It's also in the joint space.

Q: . . . Why don't you bring up those images and show the jury where you found the metal debris.

A: [T]he fluid in the joint is bright and the fat is dark. . . . And as you come down here, this is the tibia and the fibula. So this is the lateral or outside part of the ankle. Here are those little dark spots that we talked about that are outside from the open procedure.

* * *

So it's in the joint space and it's external to the joint space, because there were two different procedures performed.

Q: [D]id you find any metallic debris in the area where the EHL and EDL were located?

A: Absolutely not.

* * *

Here's the area of the tendon rupture and you see fluid there. There are no dark spots. No dark spots in there at all in the area of the tendon rupture.

Q: [W]hat do you see there where the tendons were, there's like a whitish area[?]

A: That's what we call a granulation tissue. So after there's been an injury, the body's sort of a reparative mechanism, how the body starts to repair itself. Normally it goes from granulation tissue to scar tissue.

Q: Now, is this something you'd see after a rupture of a tendon?

A: Yes.

Q: Now, would you still see metal found in there without all of that edema?

A: If there was surgery in this location, you would see the metallic artifact. You don't see any, which means there was—there's no surgery in this area.

Q: . . . So based solely upon the metal debris issue, where do you find it? Where don't you find it, and what conclusions have you reached because of that?

A: I find it where there was surgery performed. So during the arthroscopy portion of the study where the surgeon's in the joint, you're going to get this metallic debris which I showed. Where there was ligament repair along the outer portion of the ankle, you're going to see it there. But where the alleged laceration was of these tendons, there's no micro metallic debris there. So there was no laceration of these tendons. These tendons ruptured.

* * *

Q: [D]o you have an opinion to a reasonable degree of medical certainty as to whether [Appellee] lacerated the tendons when he did his operation in 2011?

A. There was no way he lacerated those tendons during the surgery.

Q: How can you be so confident?

A: I interpret MRI's all the time. Everything points to a rupture after the surgery.

Q: . . . And the edema that was noted on the one study of the—for January 20, 2012, the presence of the edema, as far as timing is concerned, what can you tell the jury as to the what your thoughts are in that regard?

A: That the spontaneous rupture happened three—two, three, four weeks prior to the MRI. The 2012 MRI.

Q: Doctor, do you hold all of these opinions . . . to a reasonable degree of medical certainty?

A: I do.

*Id.* at 905a-906a, 908a-909a, 911a.

In the case *sub judice*, Appellant's expert, Dr. Shapiro, opined that the tendons were damaged during the arthroscopic surgical procedure. Appellee's experts, Dr. Jacobs and Dr. Schwartzman disagreed, finding that the tendons spontaneously ruptured following surgery. The experts difference of opinion created a factual dispute. **See MacNutt**, 932 A.2d at 991. Because all three elements of Section 328(D)(1) have not been established, Appellant was not entitled to a *res ipsa loquitur* instruction. **Id.** at 992. We discern no abuse of discretion or error of law by the trial court. **Id.** at 984-85. Therefore, Appellant is not entitled to a new trial. **See Angelo**, 871 A.2d at 1279. Accordingly, we affirm the order denying Appellant's motion for post-trial relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2016

- 15 -

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CIVIL DIVISION

MICHELLE GRACE,                           :
    Plaintiff                         :
                            :
      v.                               :    Case No. 2013-C-3626
                            :
JAY H. KAUFMAN, D.P.M.,                    :
    Defendant                         :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:
               Paul A. Lauricella, Esquire
               For Plaintiff

               John R. Hill, Esquire
               For Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## O P I N I O N

**CAROL K. McGINLEY, J.**

Jury trial in the above-captioned medical malpractice case was held before the undersigned from September 14, 2015, to September 21, 2015. The jury returned a defense verdict in favor of Jay H. Kaufman, D.P.M. (Dr. Kaufman or Defendant). Michelle Grace (Plaintiff) filed a timely Motion for Post-Trial Relief requesting a new trial. Briefs were prepared by both parties and argument on the Motion was heard on January 15, 2016. For the reasons more specifically set forth below, the Motion for Post-Trial Relief is denied.

Plaintiff instituted this action against Defendant for injuries she alleged occurred during an arthroscopic ankle surgery performed by Dr. Kaufman on October 11, 2011. Plaintiff asserted that two tendons, the extensor hallucis longus and the extensor digitorum longus, along with the deep peroneal nerve, were severed during the surgery. Dr. Kaufman contended that the two tendons and nerve were not severed during surgery, but spontaneously ruptured during Plaintiff's recovery, several weeks after the surgery. The facts presented during trial were as follows.

Plaintiff was seen by Dr. McCarroll in the spring and early summer of 2010. Notes of Testimony, September 17, 2015, p. 54-55. Dr. McCarroll diagnosed Plaintiff with an unstable ankle and arthritis in her ankle. *Id.* Plaintiff was given a brace and treated with physical therapy without improvement. Dr. McCarroll recommended surgery to stabilize the ankle. *Id.*

Plaintiff was examined by Dr. Kaufman on August 19, 2011. At that time, Plaintiff had no signs of any injury to the extensor hallucis longus or extensor digitorum longus tendons, the tendons responsible for extending the toes upward. She was able to move her toes up and down and wiggle them. Notes of Testimony, September 15, 2015, pp. 8-11. In addition, there was no sign of injury to her deep peroneal nerve at the time of that initial assessment and she had no neurological symptoms at the August 19, 2011, visit. *Id.* at 15-17. An MRI obtained a year prior to Plaintiff's first visit with Dr. Kaufman confirmed that there were no problems with the extensor hallucis longus and extensor digitorum longus tendons prior to the August 19, 2011, visit; the tendons and nerve were intact. *Id.* at 12-14.

Dr. Kaufman diagnosed Plaintiff with left ankle pain with degenerative joint disease and left lateral ankle instability. Plaintiff's Exhibit 10. Dr. Kaufman performed left ankle arthroscopic surgery and a modified Brostrom Procedure on Ms. Grace on October 11, 2011. *Id.* at 33.

2

It was Plaintiff's contention at trial that Dr. Kaufman severed the tendons and nerve during the arthroscopic portion of the surgery. The extensor hallucis longus and extensor digitorum longus tendons as well as the deep peroneal nerve are all located outside of the ankle joint. In order for the tendons and nerve to be severed during the surgery, Dr. Kaufman would have had to use the surgical instruments outside of the ankle joint at some point during the procedure. Notes of Testimony, September 16, 2015, pp. 54-55. Plaintiff's expert, Dr. Howard S. Shapiro, a podiatrist, opined that the tendons and nerve could have been severed in one of two ways. One possibility was that Dr. Kaufman began the procedure in the ankle joint, but shaved through the ankle joint which put his instruments in contact with the tendons and nerve, cutting them. The second possibility was Dr. Kaufman was never in the ankle joint, but instead was in the subcutaneous tissue above the joint capsule; he was in contact with the tendons and nerve and severed them. Notes of Testimony, September 16, 2015, pp. 54-55.

Defendant presented testimony to support the finding that if the joint capsule was violated, the fluid pressure in the joint would be out of balance; the loss of fluid in the joint would cause the joint space to deflate, and the surgeon would not be able to see inside the joint capsule to perform the necessary tasks related to the arthroscopic surgery. Notes of Testimony, September 18, 2015, pp. 57-58. In addition, if the tendons and nerve were severed, significant blood loss would be expected during the surgery due to the close proximity of veins and arteries that would also be cut. The additional blood loss would occur even with a tourniquet. Notes of Testimony, September 18, 2015, pp. 59-66.

A camera was used during the procedure and allowed Dr. Kaufman to photograph and document the surgery. *Id.* at 44-45. Pictures taken during the arthroscopic surgery depict that the procedure was performed inside the ankle joint; pictures also depict Dr. Kaufman was in the

3

ankle joint prior to removing his instruments at the conclusion of the arthroscopic surgery. Notes of Testimony, September 17, 2015, pp. 56-58, 88; Notes of Testimony, September 18, 2015, pp. 48-57. During the procedure, Dr. Kaufman used a camera to visualize the area and a gator tool to scrape and remove synovium, the lining of the joint. Notes of Testimony, September 18, pp. 51-52, 66-67. The jury examined the gator, and Dr. Kaufman testified that in order for the gator to cut a tendon, the gator would have to have contact with the tendon for fifteen to twenty minutes. *Id.* at 68. There was no loss of fluid pressure during the surgery as would occur if the joint capsule was compromised, and the amount of blood loss was within the normal limits. Notes of Testimony, September 17, 2015, pp. 56-57; Notes of Testimony, September 18, 2015, pp. 57-66. There were no problems noted in the operative report and there were no problems post-operatively regarding additional bleeding at the surgical site. Notes of Testimony, September 17, 2015, p. 57; Notes of Testimony, September 18, 2015, pp. 58, 66.

Immediately following the conclusion of the operation, Plaintiff was placed in a rigid, posterior splint to maintain the ligament repair so that she would not overstretch it or re-aggravate the stability of the ankle. Notes of Testimony, September 15, 2015, pp. at 36-37; Notes of Testimony, September 18, 2015, p. 71. Plaintiff's tight Achilles tendon prevented the splint from being placed on her foot and leg at the optimal 90-degree angle. *Id.* at 82. The splint was not removed until her first post-operative visit.

Dr. Kaufman's staff called Plaintiff on October 14, 2011; there were no issues raised by the Plaintiff related to the procedure[1] and she did not require prescription pain medicine following the procedure. Notes of Testimony, September 18, 2015, p. 69.

Plaintiff's first post-operative visit was on October 19, 2011. *Id.* at 37. Plaintiff complained of mild numbness and tingling on the top of her foot. *Id.* at 41. The symptoms were

---

[1] Plaintiff had an unrelated question related to whether it was safe for her to take Mucinex following the surgery.

a normal consequence of the surgery. Notes of Testimony, September 17, 2015, pp. 58-59; Notes of Testimony, September 18, 2015, p. 73. Dr. Kaufman's post-operative practice was to have his patients make a circle with their foot and wiggle the toes in order to look at the function of the tendons. Dr. Kaufman noted in his chart "neurovascular intact" because Plaintiff could move her foot and ankle. *Id.* at 74-75. The splint was removed at this visit and Plaintiff's foot was put into a cast. *Id.* at 77; Notes of Testimony, September 15, 2015, pp. at 46.

Plaintiff's cast was removed at the next visit on November 2, 2011. *Id.* at 47-48. Plaintiff was having difficulty extending her toes; she could move her foot up and down but had weakness pulling the toes up. *Id.* at 48-49; Notes of Testimony, September 17, 2015, p. 59. The notes from this visit state: "Quality: improving; Severity: mild; Prior Studies: none." Notes of Testimony, September 18, 2015, p. 78; Defense Exhibit 10. Dr. Kaufman's assessment was: "inspection: no cellulitis or dehiscence and incision edges are normal (anterior and lateral ankle, neurovascular intact; weakness of extensors noted to lesser toes and able to dorsiflex foot) and sutures intact." Defense Exhibit 10. There was nothing unusual at this visit; Dr. Kaufman took out the stitches and put Plaintiff in a brace. Notes of Testimony, September 17, 2015, p. 59. Plaintiff was permitted to bear weight on her ankle to tolerance with no restrictions. Notes of Testimony, September 18, 2015, p. 81.

On November 4, 2011, Plaintiff called Dr. Kaufman's office to relay that she has a lot of swelling in her ankle and it is warm to the touch. Notes of Testimony, September 18, 2015, p. 85. Blood work was ordered to rule out infection. Plaintiff was told to rest, ice, and elevate the ankle, and she was told that if she continued to have pain over the weekend, she was to go to the emergency room. A visit was scheduled for November 7, 2011. *Id.* at 86.

On November 7, 2011, Plaintiff complained of "increased swelling [of] left foot and stiffness with bending her toes." *Id.* at 87; Defense Exhibit 10. The notes from this visit state: "Quality: burning; pins and needles on top of foot; Severity: moderate; Timing: recurrent; Aggravating factors: ROM; when touched." Notes of Testimony, September 18, 2015, p. 87; Notes of Testimony, September 15, 2015, pp. 42-43; Defense Exhibit 10. After ruling out infection, Dr. Kaufman prescribed physical therapy. Notes of Testimony, September 17, 2015, p. 60; Defense Exhibit 10.

Plaintiff treated with physical therapy beginning in November 2011 for about two months. Notes of Testimony, September 18, 2015, p. 93. Dr. Kaufman was not made aware of any problems during the period of time Plaintiff received physical therapy. *Id.* The physical therapist documented that Plaintiff had a two over five rating for strength to her extensor tendons. Notes of Testimony, September 15, 2015, p. 60.

After approximately two months of physical therapy, Plaintiff discussed with Dr. Kaufman her concern that she was not appropriately responding to physical therapy. Notes of Testimony, September 18, 2015, p. 94.

Plaintiff had an office visit on January 11, 2012. Plaintiff stated she had numbness and was unable to pull her toes up. The notes from this visit state: "Quality: numb, pins & needles; Severity: mild; Timing: constant; Aggravating factors: walking; walking without shoes." Defense Exhibit 10. Dr. Kaufman's inspection was: "no cellulitis or dehiscence and incision edges normal (anterior and lateral ankle, neurovascular intact with exception of light sensory loss dorsally over 1st ray to 4th ray extending from hindfoot to toes as noted previously; weakness of toe extensors appreciated but ankle equinus remains but able to dorsiflex foot; ankle appears stable clinically); inflammation lateral margin left hallux nailfold consistent with paronychia, no

purulence noted." *Id.* The office notes also state: "[Plaintiff] has improved with [t]he ankle and now feels more stable but there is still sensory deficit as well as continued inability to dorsally contract lesser toes, left foot. I have suggested MRI left ankle to evaluate integrity of EDL and prescribed oral antibiotic for the toe, but may require I&D accordingly." *Id.* Dr. Kaufman ordered an MRI of the left ankle.

Plaintiff had an MRI taken of her ankle on January 20, 2012. The MRI showed that the extensor hallucis longus and extensor digitorum longus tendons were ruptured. Notes of Testimony, September 15, 2015, pp. 18-19. Both tendons split at the same location at the level of the ankle. *Id.* at 20-22. Notes of Testimony, September 21, 2015, pp. 61-65.

Plaintiff had an appointment with Dr. Kaufman on January 25, 2012, to discuss the MRI results. The office notes state that she "continues with the inability to move her toes upward in addition to some numbness." It further states: "sensory loss dorsally over 1st ray to 4th ray extending from hindfoot to forefoot, loss of gross extensor power to 1st, 2nd, 3rd and 4th digits." Defense Exhibit 10. Dr. Kaufman discussed with Plaintiff the possibility of reconstructive surgery. *Id.*

After learning the results of the January 20, 2012, MRI from Dr. Kaufman, Plaintiff sought a second opinion regarding the status of her ankle and went to Barry A. Ruht, M.D. Dr. Ruht ordered a second MRI, this time of Plaintiff's foot. Notes of Testimony, September 18, 2015, p. 100. The February 1, 2012, MRI states, "suggestion of tendinosis of the extensor digitorum tendon over the level of the tarsus," the tarsus is the mid-foot, right in front of the ankle joint. Notes of Testimony, September 18, 2015, p. 142.

7

Plaintiff's last visit with Dr. Kaufman was on February 21, 2012. Dr. Kaufman recommended to Plaintiff that she should consider further options so that her tendons could be repaired in a timely manner. Defense Exhibit 10.

Plaintiff subsequently sought treatment with Gerald J. Cush, M.D. who performed surgery to restore some of Plaintiff's function in her toes. Dr. Cush was able to identify the bottom part of the extensor hallicus longus tendon and attach it to a different tendon in order to promote a strut, a position where the big toe stays up, with the ability to flex it down. Notes of Testimony, September 15, 2015, pp. 24-27.

## DISCUSSION

Plaintiff asserts that she is entitled to a new trial because the court erred in failing to instruct the jury on *res ipsa loquitur* and because the court erred in permitting testimony of defense expert Gregory Schwartzman, M.D. that was outside the scope of his report.

The Pennsylvania Supreme Court has enunciated a two-step process in reviewing a motion for new trial at the post-trial level. First, the court must decide whether or not one or more mistakes occurred at trial. *Harmon v. Borah*, 562 Pa. 455, 756 A.2d 1116 (Pa. 2000). Secondly, if a mistake did occur, the court must determine if the mistake constituted a sufficient basis for granting a new trial under the harmless error doctrine. *Id.* at 1122.

We first address the issue of whether Plaintiff is entitled to a new trial based on the allegation that this court erred in failing to provide the jury with a *res ipsa loquitur* instruction. In so doing, we note:

> Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or

8

unless there is an omission in the charge which amounts to a fundamental error. In reviewing a trial court's charge to the jury we must look to the charge in its entirety.

*Underwood ex rel. Underwood v. Wind,* 954 A.2d 1199, 1204, 1212 (Pa. Super. 2008),

citing *Quinby v. Plumsteadville Family Practice, Inc.,* 589 Pa. 183, 197, 907 A.2d 1061, 1069–

1070 (2006).

The question before us is: was it a fundamental error not to charge the jury with a *res ipsa*

*loquitur* instruction.

The well-established general rule in Pennsylvania is that a medical malpractice claimant

must establish, through competent expert testimony, that a defendant-physician breached the

applicable standard of care and that the breach caused injury to the plaintiff. *Hamil v. Bashline,*

392 A.2d 1280 (Pa. 1978). *"Res ipsa loquitur* is a short-hand expression for a rule of evidence

which allows a jury to infer the existence of negligence and causation where the injury at issue is

one that does not ordinarily occur in the absence of negligence." *Sedlitsky v. Pareso,* 400 Pa.

Super. 1, 582 A.2d 1314 (1990), citing *Gilbert v. Korvette,* 327 A.2d 94 (Pa. 1975).

In *Gilbert v. Korvette,* 327 A.2d 94 (Pa. 1975), the Pennsylvania Supreme Court adopted

the Restatement (Second) of Torts § 328D, regarding the principle of *res ipsa loquitur,* as the law

of this Commonwealth. The Restatement provides as follows:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) The event is of the kind which ordinarily does not occur in the absence of negligence;

(b) Other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) The indicated negligence is within the scope of the defendant's duty to the plaintiff.

9

(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

Restatement (Second) of Torts § 328D (1965).

A plaintiff is entitled to a jury instruction on *res ipsa loquitur* where she has satisfied all

three elements of Section 328D(1).

> After all three elements have been established, if reasonable persons may reach different conclusion[s] regarding the negligence of the defendant, then it is for the jury to determine if the inference of negligence should be drawn. *Leone [v. Thomas*, 428 Pa. Super. 217, 630 A.2d 900 (1993)] at 901; Restatement (Second) of Torts § 328D(3). Significantly, if there is **any other cause** to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant. *Fredericks v. Atlantic Refining Co.*, 282 Pa. 8, 15, 127 A. 615, 617 (1925 (citing *East End Oil Co. v. Pennsylvania Torpedo Co.*, 190 Pa. 350, 42 A. 707 (1899)(emphasis added).

*MacNutt v. Temple Univ. Hosp., Inc.*, 932 A.2d 980 (Pa. Super. 2007).

The first element to examine is whether "the event is of the kind which ordinarily does

not occur in the absence of negligence." Restatement (Second) of Torts § 328D(1)(a). The

Restatement includes three comments on Clause (a) of Subsection (1). One such comment

describes plaintiff's burden of proof related to the first element. The comment states:

> *e. Permissible conclusion.* The plaintiff's burden of proof (see § 328A) requires him to produce evidence which will permit the conclusion that it is more likely than not that his injuries were caused by the defendant's negligence. Where the probabilities are at best evenly divided between negligence and its absence, it becomes the duty of the court to direct the jury that there is no sufficient proof. The plaintiff need not, however, conclusively exclude all other possible explanations, and so prove his case beyond a reasonable doubt. Such proof is not required in civil actions, in contrast to criminal cases. It is enough that the facts proved reasonably permit the conclusion that negligence is the more probable explanation. This conclusion is not for the court to draw, or to refuse to draw, in any case where either conclusion is reasonable; and even though the court would not itself find negligence, it must still leave the question to the jury if reasonable men might do so.

10

Restatement (Second) of Torts § 328D (1965).

The immediate problem in trying to apply the *res ipsa loquitur* doctrine to the facts at issue in this case is that the "event" at issue is disputed. Plaintiff asserts that the tendons and nerve involved in this case are not ordinarily damaged during an arthroscopic ankle surgery in the absence of negligence. Defendant agrees with the assertion that the tendons and nerve are not injured during arthroscopic surgery absent negligence, but disagrees that Plaintiff's injury happened during surgery; and, instead, argues that the tendons spontaneously ruptured several weeks post-operatively when Plaintiff began bearing weight on the ankle while wearing a splint.

We find that this case is on point with *MacNutt, supra.*, a case where the Superior Court denied plaintiffs' request for a new trial holding that the trial court did not err in precluding plaintiffs from presenting their medical malpractice case on a theory of *res ipsa loquitur* or from denying the *res ipsa loquitur* jury instruction.

In *MacNutt*, plaintiff sought medical treatment for Thoracic Outlet Syndrome, a condition that rendered plaintiff's arms cold and paralyzed on an intermittent basis. During one of two operations for the condition, plaintiff alleged he suffered a chemical burn to the left side of his shoulder. Plaintiff offered expert testimony that supported the theory that plaintiff was burned as a result of lying in an unconscious state for an extended period of time in a surgical preparatory cleansing solution composed of Betadine and alcohol that pooled under plaintiff's body.

Defendants argued that plaintiff did not suffer a chemical burn during the surgery, and instead offered expert testimony to support the conclusion that plaintiff suffered from an outbreak of shingles or herpes zoster. The expert testimony further described that such outbreaks can cause scarring and permanent pain. In addition, the outbreaks are often misdiagnosed. The

11

expert attacked plaintiffs' expert's opinion by asserting a lack of factual basis and arguing that

the Betadine could not cause a third-degree burn such as that asserted by plaintiffs.

Because we find that the *MacNull* case is on point with the facts presented in this case,

we quote from it at length:

> Applying the Restatement principles to Appellants' case, we first observe the parties' experts intensely disputed the exact nature of Appellant's injury. Dr. Whelchel opined Appellant had sustained a chemical burn resulting from lying in a pool of Betadine solution for an extended period of time. (N.T. Trial, 10/4/04, at 362–64). Appellees' expert, Dr. Lessin, opined Appellant had suffered an outbreak of herpes zoster or shingles. (*Id.* at 879–83). Because the nature of the injury was itself in dispute, the court correctly determined the injury could have occurred without negligence. This controversial testimony presented an issue of fact regarding the nature of Appellant's injury as well as **where** the event actually took place. Therefore, Appellants failed to establish the first element of *res ipsa loquitur*. See Restatement (Second) of Torts § 328D(1)(a).
>
> Likewise, the parties' experts hotly disputed whether other responsible causes for Appellant's injury could be sufficiently eliminated. For the defense, Dr. Lessin addressed the dermatological patterns seen in photographs of Appellant's injury. Dr. Lessin testified as follows:
>
> > Q: Doctor, some of the pictures you showed us, they appear to have other markings or other descriptions besides just redness. Could you explain what those markings are and how a physician might look at those?
> >
> > A: Basically, when herpes zoster erupts, it produces a blister. The blisters tend to be grouped or clustered together, an associated degree of redness of the skin and that can vary. What doesn't vary, again, is the distribution of the blistering and the redness. That's the diagnostic hallmark. So you can see blisters. And the blisters can become [purulent] and the blisters can become crusted. The blisters can become ulcerated. There's a variety of different skin lesions you see within this distribution mostly as a result of time. But acutely it's a blistering red eruption. These photographs depict different time points during [Appellant's] herpes zoster.
> >
> > Q: Dr. Lessin, is there a differential diagnosis that plays a part in coming to an impression of herpes zoster?
> >
> > A: Virtually, no. The dermatomal distribution is so diagnostic, it's hard to imagine another entity causing that type of distribution.

(N.T. at 879–80). Dr. Lessin further responded to Dr. Whelchel's theory of negligence as follows:

12

Q: Can [Dr. Whelchel's] type of diagnosis or impression be made in looking at this photograph?

A: I do not think so.

Q: Why is that?

A: Because it doesn't look like a burn caused by Betadine. Looks like herpes shingles. Herpes zoster or shingles. And that is because Betadine, which is a topical antiseptic, if left on the skin to a point where it irritates the skin, it will result in very defined borders in which the solution touches the skin. Sort of a high water mark where flood waters touch land or building. You will see a pattern of the pooling of any allergic or irritant on the skin. You don't see that. You see a dermatome distribution.

(*Id.* at 881). Appellees' expert, Dr. Noble, also opined the photographs of Appellant's injury were inconsistent with Dr. Whelchel's theory of Betadine pooling and burn. (*Id.* at 933).

Appellees' experts produced sufficiently conclusive evidence that Appellant's injury was a skin eruption of herpes zoster and not a Betadine burn. Thus, Appellants were unable to eliminate other possible causes of Appellant's injury. See *Fredericks, supra*; Restatement (Second) of Torts § 328D(1)(b). The difference of opinion on the nature of Appellant's injury as well as the competent evidence of another possible cause for the injury also created a factual dispute regarding whether Appellant's injury was outside the scope of Appellees' duty to Appellant. See Restatement (Second) of Torts § 328D(1)(c). Therefore, Appellants did not satisfy the necessary factors under the Restatement to proceed under the doctrine of *res ipsa loquitur*. See *Leone, supra*. Accordingly, we hold this case was not in reality a *res ipsa loquitur* case, and the court's decision to deny Appellants a new trial on this ground must stand. *See Ettinger, supra*.

With respect to Appellant's claim that the trial court should have given a *res ipsa loquitur* instruction to the jury, Pennsylvania law makes clear that the court is bound to charge the jury "only on the law applicable to the factual parameters of a particular case and that it may not instruct the jury on inapplicable legal issues." *Angelo v. Diamontoni*, 871 A.2d 1276, 1279 (Pa. Super. 2005), *appeal denied*, 585 Pa. 694, 889 A.2d 87 (2005) (quoting *Cruz v. Northeastern Hosp.*, 801 A.2d 602 (Pa. Super. 2002)). "Consequently, where the record [evidence fails] to satisfy the elements of a particular legal doctrine, the court may not discuss that doctrine in its charge." *Id.* Challenges to a court's jury instructions are subject to an abuse of discretion standard of review. *Butler v. Kiwi, S.A.*, 412 Pa. Super. 591, 604 A.2d 270, 272 (1992), *appeal denied*, 531 Pa. 650, 613 A.2d 556 (1992). "The court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure." *Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa. Super. 2000). Instantly, we have already determined the trial court properly precluded Appellants from utilizing the doctrine of *res ipsa loquitur* to create the inference

13

of Appellees' negligence. The evidence did not support the use of the *res ipsa loquitur* doctrine; therefore, the trial court correctly refused to instruct the jury on that legal theory. *See Angelo, supra.* Thus, we will give this claim no additional attention.

*Id.* at 990-92.

In this case, like *MacNutt*, an issue of fact regarding the nature of Plaintiff's injury as well as where/when the event actually took place was in dispute: was the injury severed tendons or spontaneously ruptured tendons; did the injury take place during the October 11, 2011, surgery or several weeks after surgery?

Plaintiff's expert, Dr. Shapiro, argued that Plaintiff had damage to her tendons from surgery and opined that the tendons were injured during the arthroscopic procedure. Notes of Testimony, September 16, 2015, pp. 49-51. Dr. Shapiro opined that Dr. Kaufman caused the gator to come into contact with the tendons, severing them. *Id.* at 54-55. Dr. Shapiro also vehemently denied the possibility of the tendons spontaneously rupturing as opined by the defense experts. *Id.* at 53-54.

Defendant's experts, Drs. Jacobs and Schwartzman, asserted that the tendons were not severed, but spontaneously ruptured weeks after the surgery. Dr. Jacobs testified that the only way the tendons and nerve could have been severed during surgery is if Dr. Kaufman cut through the capsule of the ankle, and cut the nerve, artery, veins, and tendons. Notes of Testimony, September 17, 2015, p. 66. Defendant produced evidence to support Drs. Jacobs and Schwartzman's contention and to dispute Plaintiff's theory.

The pictures taken during the procedure show Dr. Kaufman was inside of the ankle joint. There is no mention in the operative report of loss of fluid, an event that would be expected if the capsule was violated. The blood loss during the procedure was within the expected range and there is no mention in the operative report or noted in the post-operative care indicating that

14

additional blood was lost, which would occur if a nearby artery or vein was cut. Notes of Testimony, September 17, 2015, pp. 56-58, 88; Notes of Testimony, September 18, 2015, pp. 48-66.

In addition, the post-operative MRI did not evidence any damage to the ankle joint or soft tissue. Notes of Testimony, September 17, 2015, p. 66. Drs. Jacobs and Schwartzman both testified that if Dr. Kaufman severed the tendons and nerve during surgery, there would be evidence of the surgical track outside of the joint space on the post-operative MRI. The MRI did not evidence that Dr. Kaufman went outside of the joint space during the operation. Also, the gator instrument used during the procedure leaves a trail of metal fragments in its wake; metal fragments were found in the joint space, but no metal fragments were found outside of the joint space near the two tendons. Notes of Testimony, September 17, 2015, pp. 66-67; Notes of Testimony, September 21, 2015, pp. 59-62.

Additionally, Defendant's experts based their opinion that the tendons ruptured on the second post-operative MRI that revealed that Plaintiff had tendinosis or diseased extensor tendons. Notes of Testimony, September 17, 2015, p. 63. Dr. Jacobs testified that even though this is not common, he found over 450 cases of this problem in the literature that he reviewed. *Id.* Dr. Jacobs opined that the tendons ruptured as a result of Plaintiff's tendinosis, which predisposed her to tendon rupture. *Id.* Tendinosis causes the tendons to degenerate, which cause the tendons to weaken. Plaintiff was put in a cast and later a splint, and was using the ankle muscles to swing the foot with the added weight of the cast or splint. The tendons could not take the pressure and they ruptured. *Id.* at 98-99. Plaintiff had several factors that contributed to the tendinosis: she had equinus (tight calf muscle), was overweight, and she was flat-footed. *Id.* at 100-101. Tendinosis is the most common cause of spontaneous rupture. *Id.* at 102.

15

Dr. Jacobs also offered an opinion regarding Plaintiff's nerve problem. He opined that she had bad nerves going into her foot that nobody knew about. *Id.* at 64. She had compressed nerves in her back going into her foot that made those nerves more susceptible to pressure. *Id.* Therefore, when she was placed in a splint, there was added pressure on the nerves.

The question pursuant to the first element of the Restatement is whether the event is of the kind which ordinarily does not occur in the absence of negligence. Restatement (Second) of Torts §328D(1)(a). The nature of the injury here is in dispute and, pursuant to the Defendant's theory, the injury could have occurred in the absence of negligence. Defendant's theory was supported by evidence and directly contradicted Plaintiff's theory.

As such, we find Plaintiff did not provide sufficient evidence to support the conclusion that the negligence of Dr. Kaufman more likely than not caused Plaintiff's injuries. We find in this instance that the probabilities of negligence or its absence were evenly divided, at best. Accordingly, Plaintiff failed to meet the first element required for the doctrine of *res ipsa loquitur*.

The second element plaintiff must prove under the Restatement (Second) of Torts § 328D(1)(b), is whether "other responsible causes, including the conduct of the plaintiff and third persons are sufficiently eliminated by the evidence." We again look for guidance in the Comment to Clause (b) of Subsection (1), which states:

> *f. Eliminating other responsible causes.* It is never enough for the plaintiff to prove that he was injured by the negligence of some person unidentified. It is still necessary to make the negligence point to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where there is no doubt that it is at least equally probable that the negligence was that of a third person, the court must direct the jury that the plaintiff has not proved his case. Again, however, the plaintiff is not required to exclude all other possible conclusions beyond a reasonable doubt, and it is enough that he makes out a case from which the jury may reasonably conclude that the negligence was, more probably than not, that of the defendant.

16

Restatement (Second) of Torts § 328D (1965).

"The critical inquiry as to this element is 'whether a particular defendant is the responsible cause of the injury.'" *Fessenden v. Robert Packer Hosp.*, 97 A.3d 1225 (Pa. Super. 2014), quoting, *Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 907 A.2d 1061 (2006)

In evaluating this element, we rely on the evidence addressed in our review of the first element, including the defense experts' opinions regarding the spontaneous ruptures of the tendons and their reliance on the physical evidence to support their theory. In addition, the defense also presented evidence in the medical records that supported their theory that Plaintiff had the ability to move her foot post-operatively and that her symptoms changed in November of 2011, after she began bearing weight on her ankle. The symptoms she complained of in November were consistent with a gradual rupture of the tendons. Notes of Testimony, September 17, 2015, pp.143-147. Taken together, the evidence produced by Defendant was sufficiently conclusive that the Plaintiff's injury was the result of spontaneously ruptured tendons. Accordingly, Plaintiff was unable to eliminate other possible causes of Plaintiff's injury as required in establishing the second element of *res ipsa loquitur*.

The third *res ipsa loquitur* element is that "the indicated negligence is within the scope of the defendant's duty to the plaintiff." Restatement (Second) of Torts § 328D. This element was not met because Plaintiff has not met her burden in establishing an "indicated negligence." Because the nature of the injury was disputed and other responsible causes were not sufficiently eliminated, there was no "indicated negligence" to examine to determine if such negligence was within the duty of Dr. Kaufman. There was no dispute that if the injury occurred during the

17

surgery, that such negligence was within Dr. Kaufman's duty of care. However, if the injury was a spontaneous rupture, then the injury was outside of Dr. Kaufman's duty to Plaintiff.

Plaintiff was unable to sufficiently establish evidence to support the three elements required in order for the doctrine of *res ipsa loquitur* to apply. Accordingly, Plaintiff was not entitled to a *res ipsa loquitur* jury instruction. Because we find no error was made in determining that the *res ipsa loquitur* instruction was not applicable in this case, we conclude Plaintiff is not entitled to a new trial based on that claim.

The second issue raised by Plaintiff in her post-trial motion is whether this court erred in permitting testimony of defense expert Gregory Schwartzman, M.D. outside the scope of his report.[2]

When evidentiary rulings are at issue, a trial court's decisions as to those rulings are "controlled by the sound discretion of the trial court." *Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 59 (Pa. Super. 2004). Those rulings should not be disturbed at either the post-trial or appellate levels unless a clear abuse of discretion is demonstrated. *Id.* Accordingly, the standard of review in assessing an evidentiary ruling of a trial court is "extremely narrow" and may be only reversed upon a showing of manifest abuse of discretion. *King v. Stefenelli*, 862 A.2d 666, 675 (Pa. Super. 2004); *Eichman v. McKeon*, 824 A.2d 305, 319 (Pa. Super. 2003). "An abuse of discretion exists when the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious, fails to apply the law or is motivated by partiality, prejudice, bias or ill will." *Daddona v. Thind*, 891 A.2d 786, 799 (Pa. Cmwlth. 2006).

---

[2] Plaintiff raised this issue in her Motion for Post-Trial Relief and supporting brief, but did not argue this issue before the court at the time of argument.

18

Pennsylvania Rule of Civil Procedure 4003.5 provides that "...the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. ..." In determining whether the expert's testimony exceeds the fair scope of his or her report, the specific inquiry is whether, under the particular facts of each case, the discrepancy between the expert's pre-trial report and his or her trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response. *Woodard v. Chatterjee*, 827 A.2d 433 (Pa. Super. 2003). Further, the decision to admit evidence outside of the fair scope of an expert report is not reversible error absent prejudice or surprise to the opponent. *Christiansen v. Silfies*, 446 Pa. Super. 464, 477, 667 A.2d 396, 402 (1995).

Plaintiff takes issue with the following testimony of Dr. Schwartzman, an expert in radiology that testified for the defense:

[BY MR. HILL]

Q Okay. Are there arteries in relationship to where the tendons are?

MR. LAURICELLA: Judge, objection.

THE COURT: Grounds?

MR. LAURICELLA: Scope. Nowhere.

THE COURT: Give me a moment. Do you want to point out where I can find it?

MR. HILL: Well, Your Honor, I just want to point the anatomy out to the jury.

THE COURT: The objection's overruled as long as that's going to be the only question.

MR. LAURICELLA: Judge, can I - - this is very important.

19

THE COURT: No. I know it's important, and I know everything I need to know. I've overruled the objection.

MR. LAURICELLA: Thank you.

THE COURT: It would be reasonable in light of the testimony in this case, as long as the pointing out is done, and that's it.

MR. HILL: Yes. Yes, Your Honor.

BY MR. HILL:

Q Doctor.

A So just answer the question?

Q Yes. Yes.

A So here's an artery or a vein. It's a blood vessel that runs deep - - deep to the tendons, and you can see that on this image.

Notes of Testimony, September 21, 2015, pp. 46-47.

Dr. Schwartzman was permitted to testify regarding the location of an artery or vein depicted on the MRI of June 28, 2010. In Dr. Schwartzman's expert report he stated that he reviewed the June 28, 2010, MRI. The testimony at issue was permitted to orient the jury to the foot and ankle anatomy depicted on the MRI that was on display to the jury. Dr. Schwartzman was not permitted to testify about the vessel beyond identifying its existence and even that testimony was limited to one occurrence. *Id.* at 48-49.

It was not unreasonable to allow Dr. Schwartzman the opportunity to identify the anatomy in close proximity to the area to which he was to testify, especially anatomy pictured in an MRI referenced in his report and published to the jury without objection. Dr. Schwartzman was not the only witness to testify about the presence of an artery or vein located between the joint space and tendons and we do not find that Plaintiff was prejudiced or surprised by its

20

identification. Therefore, we deny Plaintiff's request for a new trial based on her assertion that this court erred in permitting Dr. Schwartzman to testify outside the scope of his report.

In conclusion, after careful review of the issues raised by Plaintiff, we find this court did not err in precluding the jury instruction on *res ipsa loquitur* or in permitting Dr. Schwartzman to identify the blood vessel on the MRI published to the jury. Plaintiff is not entitled to a new trial and her Motion for Post-Trial Relief is denied.

DATE: February 1, 2016

BY THE COURT:

CAROL K. McGINLEY, J.

21

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CIVIL COURT DIVISION

## Document Distribution List

File No.: 2013-C-3626

2/2/2016

| John R Hill, Esq | ✓ | The Perry Law Firm LLC<br>Suite 740<br>87 South Commerce Way<br>Bethlehem PA 18017 |
|---|---|---|
| Slade H McLaughlin, Esq | ✓ | McLaughlin & Lauricella PC<br>One Commerce Square Suite 2300<br>2005 Market Street<br>Philadelphia PA 19103 |
| Mark T Perry, Esq | ✓ | The Perry Law Firm LLC<br>305 Linden Street<br>Scranton PA 18503 |
| Neil E Wenner, Esq | ✓ | The Perry Law Firm LLC<br>Suite 740<br>87 South Commerce Way<br>Bethlehem PA 18017 |

### 236 NOTICE

Pursuant to Pa.R.C.P. § 236, notice is hereby given that an order, decree, or judgment in the above captioned matter has been entered.

Andrea E. Naugle
Clerk of Judicial Records

CV15b