Jacqueline Nieves CRUZ, Oscar Cruz as Parents and Natural Guardians of Adam Omar Cruz, a minor, and Jacqueline Nieves Cruz and Oscar Cruz, in their own right

v.

NORTHEASTERN HOSPITAL, Myung Hyo Shin, M.D., and Robert Cogan, M.D.

Appeal of Northeastern Hospital.
(at 123,125 and 267)

Jacqueline Nieves Cruz, Oscar Cruz as Parents and Natural Guardians of Adam Omar Cruz, a minor and Jacqueline Nieves Cruz, and Oscar Cruz in their own right

v.

Northeastern Hospital, Myung Hyo Shin, M.D., and Robert Cogan, M.D.

Appeal of Jacqueline Nieves Cruz, Oscar Cruz, as Parents and Natural Guardians of Adam Omar Cruz, a minor and

---

Jacqueline Nieves Cruz and Oscar
Cruz, in their own right. (at
265 and 266)

Superior Court of Pennsylvania.

Argued Jan. 29, 2002.
Filed June 14, 2002.

Alan S. Gold, Elkins Park, for Northeastern Hospital.

Anne E. Pedersen, Philadelphia, for Cruz.

Before JOHNSON, MUSMANNO and BROSKY, JJ.

MUSMANNO, J.

¶ 1 Appellant Northeastern Hospital ("Northeastern") appeals from the judgment entered against it and in favor of Appellees Jacqueline Nieves Cruz ("Mother") and Oscar Cruz ("Father") (collectively, "the Cruzes"), as parents and guardians of Adam Omar Cruz ("Adam"), in the amount of $15,180,330.65 in this medical malpractice action.[1] The Cruzes have filed a cross-appeal challenging the trial court's calculation of delay damages. We affirm.

¶ 2 The trial court summarized the history underlying the instant appeal as follows:

---

1. Myung Hyo Shin, M.D. ("Dr.Shin") and Robert Cogan, M.D. ("Dr.Cogan") have not filed an appeal of the judgment entered by the trial court.

This is a medical malpractice action filed by the parents of [Adam] on behalf of themselves and Adam, a minor, against [Northeastern, and Drs. Shin and Cogan,] both of whom specialize in obstetrics and gynecology. [Mother] sought care from Dr. Shin and Dr. Cogan at [Northeastern] in January of 199[3]. On August 11, 1993, [Mother] went to the emergency room at [Northeastern] because she had been experiencing some contractions. She was examined and released on that day. On the morning of August 12, 1993, [Mother] again went to the emergency room at [Northeastern] because she was leaking fluid and was experiencing contractions, but was again released. Late on August 12, 1993, she again appeared at the emergency room of [Northeastern] complaining of fluid leakage and mild contractions and was admitted. Her fluid leak was found at that time to be positive for amniotic fluid. Shortly after her admission she was placed on a fetal heart monitor. On the morning of August 13, 1993, [Mother] was placed on Pitocin by Dr. Cogan. Later in the day, Dr. Cogan discontinued the Pitocin and told [Mother] to ambulate the hospital floor. In the evening of August 13, 1992, [Mother] was given a sedative and told to rest overnight. At 6:00 A.M. there was a spontaneous rupture of the membranes with clear amniotic fluid. Pitocin was restarted at 9:00 A.M. along with intravenous sedation. At 3:00 P.M. it was noted that [Mother] had a temperature of 102.1 degrees, but Dr. Shin elected to treat this [condition] after delivery. At 7:13 P.M. the baby was born by spontaneous vaginal delivery. At birth[,] Adam required resuscitation and a foul smelling liquid was noted as was a cephalhematoma. The following morning[,] Adam was transferred to St.

Christopher's Children's Hospital because of suspected seizure activity.

At the time of trial[,] Adam was being given medication to treat his seizures, but was occasionally suffering breakthrough seizures. He is developmentally delayed both physically and cognitively and at last testing had a full scale IQ of 52, which is in the mild to moderate intellectually deficient range.

The case was tried ... and [the jury] returned a verdict in favor of [the Cruzes] and against [Northeastern] in the amount [of] $10,811,431 on August 3, 2000. The jury found in favor of Dr. Cogan and Dr. Shin. The claims by [the Cruzes] in their own right were withdrawn prior to the case being sent to the jury.

Trial Court Opinion, 6/11/01, at 1–2.

¶ 3 The trial court subsequently entered an Order awarding delay damages in the amount of $4,368,899.38, resulting in a total verdict of $15,180,330.65. Northeastern filed Post–Trial Motions, which the trial court denied. The Cruzes filed a Motion to mold the verdict to add delay damages, which the trial court granted in part and denied in part. Upon the entry of judgment, Northeastern filed the instant timely appeal and the Cruzes filed a cross-appeal challenging the trial court's calculation of delay damages.

¶ 4 Northeastern presents the following claims for our review:

1. Did the trial court err in denying [Northeastern's] motion for judgment notwithstanding the verdict or in the alternative for a new trial because of the failure of the Cruzes to present any expert testimony on the issue of causation since their only expert on causation, Dr. Cohen, failed to connect deviations from the standard of care by the nurses with

the injury that the Cruzes claim that their son [Adam] suffered?

2. Did the trial court err in instructing the jury that it could find in favor of the Cruzes on the issue of causation based on an increased risk of harm when no expert ever testified concerning any action or omission of the nurses of [Northeastern] increasing the risk of harm to anyone?

3. Did the trial court err in instructing the jury on spoliation of evidence when at the time of the supposed destruction and disappearance of evidence no one knew that [Adam] had suffered any injury or had a potential cause of action and insufficient evidence existed to show that any employee of [Northeastern] destroyed either intentionally or negligently any fetal monitor strip?

4. Did the trial court commit reversible error in permitting Dr. Cohen to testify as an expert on the issue of causation when he based his opinion on fetal monitor strips about which he admittedly knew nothing?

5. Did the trial court err in including in its calculation of delay damages the time period of March 28, 2000 until July 20, 2000?

Brief of Northeastern at 6. In their cross-appeal, the Cruzes challenge the trial court's calculation of delay damages. We will address these claims in order.

¶ 5 In its first claim of error, Northeastern asserts that the evidence is insufficient to establish that the deviations from the standard of care by the nurses at Northeastern caused Adam's injuries. On this basis, Northeastern claims that the trial court erred in not granting its Motion for judgment n.o.v. *See* Brief of Appellant at 21, 28. We disagree.

¶ 6 The standard by which we review the denial of a motion for judgment n.o.v. is as follows:

A [judgment n.o.v.] can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for [judgment n.o.v.], we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict .... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact .... A [judgment n.o.v.] should be entered only in a clear case.

*Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–05 (Pa.Super.1999) (citations omitted).

¶ 7 A cause of action sounding in negligence for medical malpractice requires proof of four elements: (1) that the medical practitioner owed a duty to the patient; (2) that the practitioner breached that duty; (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) that the damages suffered by the patient were the direct result of the harm. *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 891 (1990).

Where the events and circumstances of a malpractice action are beyond the knowledge of the average lay person, the plaintiff must present expert testimony that the acts of the medical practitioner deviated from good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered.

*Montgomery v. South Philadelphia Medical Group,* 441 Pa.Super. 146, 656 A.2d 1385, 1390 (1995).

¶ 8 The Pennsylvania Supreme Court outlined the following approach for determining whether causation is established in a medical malpractice case:

> Once a plaintiff has introduced evidence that a defendant's negligent act or omission **increased the risk of harm** to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Hamil v. Bashline,* 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978) (emphasis added). Applying this standard, we conclude that the evidence was sufficient to establish causation.

¶ 9 At trial, the Cruzes presented the expert medical testimony of Dr. Michael Goodman. Dr. Goodman testified that, based upon his review of the medical records, Mother was not closely watched for signs of fetal distress. N.T., 7/25/00, at 344. According to Dr. Goodman, the fetal monitor showed abnormal heart patterns, decelerations of Adam's heart rate, and a sinusoidal pattern in the heart rates. *Id.* at 343–44. Dr. Goodman opined:

> Now, each of them by themselves are not necessarily a major problem but when you have a lot of these showing up in a patient who is not close to being delivered you need to really watch that patient for signs of overt fetal distress; meaning a real drop in the baby's heart rate and the baby not doing well. And this baby was just not watched very closely.

*Id.*

¶ 10 Dr. Goodman further testified that the fetal monitor showed "variable decelerations" of the baby's heart rate, which could be a sign of umbilical cord compression, and possibly the beginning of fetal distress. *Id.* at 351. Dr. Goodman testified:

> You don't want to continue a patient in labor with late decelerations. The baby may recover from those but you don't know for sure and you have no way of looking ahead to see whether the baby is going to recover or not. So if you see variable decelerations and they become late decelerations if the baby is very close to delivery that's fine, you want to encourage the mother to deliver, give more Pitocin, use forceps or vacuum to get the baby delivered. And if the mother is not very close to delivery you do a cesarean section because the baby is showing you that he's not happy in there.

> \* \* \*

> So my analysis was that because of the infection, the strong likelihood of infection, the temperature of the mother, the fact that the fetal heart rate was abnormal and getting worse, turning from variable to variable with a late component so to speak is the way we talk about it, that this baby needed to be delivered.

*Id.* at 352, 358–59.

¶ 11 Finally, Dr. Goodman opined that the nurses deviated from the appropriate standard of care when they failed to (a) recognize abnormal fetal heart patterns and abnormalities in the fetal monitoring strip, *see* N.T. 7/25/00, at 341–42, 373, 380; (b) read and/or appreciate the severity of the patterns reflected on the fetal monitor strips, *see id.* at 373; (c) notify the physicians in a timely fashion of the abnormalities in the fetal heart tracings, *see id.* at 380; (d) chart the patient's vital signs, *see id.;* (e) take the patient's temperature in a timely fashion after her temperature

reached 102 degrees, *see id.;* (f) "monitor and chart the patient by the fact that the [fetal monitor] tracings from the latter part of the day and early evening right before delivery were not accurate at all in terms of the timing and the baby's heart rate[,]" *see id.;* and (g) attempt to obtain an accurate fetal heart tracing after the fetal scalp monitor had fallen off, *see id.* at 374.

¶ 12 The Cruzes also presented the expert medical testimony of Dr. Warren Cohen. Dr. Cohen testified that Adam suffered a hypoxic-ischemic brain injury. N.T., 6/28/00, at 807. Dr. Cohen described the injury as follows:

> Hypoxia refers to the absence or the decrease of oxygen available to the brain. Ischemia refers to a decrease in the amount of blood being supplied to the brain.

N.T., 6/28/00, at 807. In his testimony, Dr. Cohen further explained:

> I believe there was an hypoxic-ischemic injury and also there was the presence of sepsis, that is the presence of an infection throughout the baby's system and as the result of both of those there was a situation that's termed acidosis; that is, there was an excessive amount of acids in the baby's blood and the brain. Each of those things as I mentioned could by themselves cause injury to the brain but all of those things were actually going on at the same time.
>
> And I believe that the best sense that anyone could make out of this is that all of them were proceeding and causing injury to the brain at the same time.

*Id.* at 807–08. Dr. Cohen also testified that Adam suffered a brain hemorrhage. *Id.* at 811. According to Dr. Cohen, "[t]hat [kind of] bleeding in a full term baby is most of the time associated with difficult deliveries and asphyxia." *Id.*

¶ 13 In addition, Dr. Cohen testified that there were signs that Adam was in distress prior to delivery. Dr. Cohen testified, in relevant part, as follows:

> There was an abnormal slowing of the heart in response to the contractions and during those periods of time the brain is not getting enough oxygen supplied, the presence of asphyxia then can result in all of the things that I mentioned before.

*Id.* at 815. Dr. Cohen indicated that there were signs of the presence of an infection, specifically Mother's elevated temperature. *Id.* at 816.

¶ 14 Finally, Dr. Cohen indicated that such injuries develop over a period of time, and that "the longer that period of time lasts the more injury that occurs to the brain." *Id.* at 822. Dr. Cohen testified within a reasonable degree of medical certainty that Adam's prolonged exposure to these various factors in the womb increased his risk of injury. *See id.* Dr. Cohen explained:

> [T]here was sepsis; that the mother had an infection, evidence of infection over the course of hours before his birth; that he was in distress and that the monitoring showed the stress hours before his birth and that the exposure to being in the uterus under those conditions for hours is what is responsible for the injury.

* * *

> As I mentioned before, the type of injury that he sustained is an injury that occurs over a period of time and so it is my opinion that the shorter that period of time would have been, the more likely it is that Adam would have not sustained any injury at all. And the longer that period of time was the more likely it would be that he would have an injury

and the more severe that injury would be.

*Id.* at 833.

¶ 15 Thus, the Cruzes presented evidence that the nurses deviated from the standard of care by failing to monitor the vital signs of both Mother and Adam; that they failed to communicate to the physicians the signs of fetal distress exhibited by Adam; that Adam's prolonged exposure to the toxic uterine environment increased his risk of harm and the extent of that harm; and that Adam actually suffered this harm.

> [O]nce a plaintiff has demonstrated that defendant's acts or omissions ... have increased the risk of harm to another, such evidence furnishes the basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

*Hamil,* 481 Pa. at 272, 392 A.2d at 1288; *accord Mitzelfelt v. Kamrin,* 526 Pa. at 63–64, 584 A.2d at 892. Based upon the foregoing, we conclude that the trial court did not err in denying Northeastern's Motion for judgment n.o.v.

¶ 16 Second, Northeastern claims that the trial court erred in admitting the expert testimony of Dr. Cohen. According to Northeastern, Dr. Cohen's testimony was not legally sufficient on the issue of causation. Northeastern asserts that it is entitled to a new trial on this basis. Brief of Appellant at 28.

¶ 17 Our standard of review of the denial of a motion for a new trial is whether the trial court committed an error of law or an abuse of discretion that controlled the outcome of the case. *Randt v. Abex Corp.,* 448 Pa.Super. 224, 671 A.2d 228, 232 (1996). Our standard of review for evidentiary rulings by the trial court is very narrow. *Gemini Equipment v. Pennsy Supply,* 407 Pa.Super. 404, 595 A.2d 1211, 1215 (1991). In general, we may reverse only for an abuse of discretion or an error of law. *Id.*

¶ 18 Dr. Cohen testified within a reasonable degree of medical certainty that Adam's prolonged exposure to the toxic uterine environment increased his risk of suffering specific brain injuries and the severity of those injures. *See* N.T., 6/28/00, at 833. As set forth above, the testimony of Drs. Cohen and Goodman established a *prima facie* case of medical malpractice. Our review of the record discloses that the testimony of Drs. Goodman and Cohen complied with the standards set forth in *Hamil,* and we discern no abuse of discretion or error of law in the admission of Dr. Cohen's testimony.

¶ 19 Northeastern next claims that the trial court erred in instructing the jury on the issue of causation based upon an increased risk of harm. Northeastern contends that Dr. Cohen never testified that the nurse's conduct increased the risk of harm to Adam.

¶ 20 Northeastern raised this claim in its Motion for post-trial relief. Interestingly, Northeastern asserted in its Motion that it "timely and properly objected to this charge." Motion for Post–Trial Relief, 8/11/00, at ¶ 25. However, our review of the record discloses that Northeastern did not object to the jury charge on this basis. Although Northeastern objected to the trial court's jury charge on spoliation of evidence, only counsel for the physician co-defendants objected to the jury charge on increased risk of harm. N.T., 8/2/00, at 1551–52. Northeastern did not join in this objection. *Id.* at 1552.

¶ 21 "[W]here a party fails to specifically object to a trial court's jury in-

struction, the objection is waived and cannot subsequently be raised on appeal." *Randt v. Abex Corp.*, 671 A.2d at 232; *see* Pa.R.C.P. 227(b) (requiring that all exceptions to the charge to the jury be taken before the jury retires). Because Northeastern did not object to the jury charge on this basis, its claim is now waived.[2] *See* Pa.R.C.P. 227(b).

¶ 22 In its third allegation of error, Northeastern claims that the trial court erred in instructing the jury on the spoliation of evidence. The purpose of a jury charge is to clarify the legal principles at issue. *General Equip. Mfrs. v. Westfield Ins. Co.*, 430 Pa.Super. 526, 635 A.2d 173, 184 (1993). A jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations. *Von der Heide v. Department of Transportation*, 553 Pa. 120, 718 A.2d 286, 289 (1998). A trial judge is bound to charge the jury only on the law applicable to the factual parameters of a particular case and it may not instruct the jury on inapplicable legal issues. *Schaefer v. Stewartstown Dev. Co.*, 436 Pa.Super. 354, 647 A.2d 945, 947 (1994).

¶ 23 In its Opinion, the trial court determined that a jury instruction on spoliation of evidence was appropriate. We agree with the reasoning of the trial court, and affirm on the basis of its Opinion with regard to this issue.[3] *See* Trial Court Opinion, 6/11/01, at 7–8.

¶ 24 In its fourth allegation of error, Northeastern claims that the trial court erred in permitting Dr. Cohen to testify as an expert on causation. "The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court." *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super.1999). In its Opinion, the trial court set forth its basis for permitting Dr. Cohen to testify as an expert witness. We agree with the sound reasoning of the trial court and discern no abuse of discretion in this regard. We therefore affirm on the basis of the trial court's Opinion with regard to this claim. *See* Trial Court Opinion, 6/11/01, at 4–6.

¶ 25 Finally, in its fifth allegation of error, Northeastern challenges the trial court's calculation of delay damages. The Cruzes have filed a cross-appeal, also challenging the trial court's calculation of delay damages. We will address these claims together.

¶ 26 On February 23, 1999, the Cruzes requested a continuance of the trial date, because Father had been called to active service with the U.S. Army in Guatemala from March 6, 1999 through March 20, 1999. On March 3, 1999, the trial court entered an Order continuing the case based upon the Soldiers and Sailors' Civil

2. Even if Northeastern had properly preserved this claim, we would still deny Northeastern relief on this basis. As set forth above, the Cruzes established a *prima facie* case of malpractice based upon an increased risk of harm. Accordingly, a jury charge on this issue was appropriate.

3. We additionally note that at trial, the Cruzes presented the deposition testimony of Nurse Anna Schild ("Schild"). Schild testified that Adam was "not well" when he was born, that the amniotic fluid was "smelly," and that "they had to work on the baby," who needed resuscitation. N.T., 7/25/00, at 293–94. She also indicated that Mother's temperature was elevated, and that Adam's scalp electrode had fallen off. *Id.* at 291. Northeastern also presented the expert testimony of a nurse, who acknowledged that blocks of the fetal monitoring strip were missing. N.T., 7/31/00, at 1119. Based upon this evidence, we cannot conclude that the trial court erred or abused its discretion in charging the jury on the spoliation of evidence.

Relief Act, 50 U.S.C.App. §§ 501–591 (1981) (the "Act"). However, the trial court's Order did not set a new trial date. The case remained on "deferred" status until January 24, 2000, at which time the trial court listed the case for trial on March 27, 2000.

¶ 27 On February 8, 2000, the trial court entered an order continuing the case based upon the Cruzes' request for a continuance. Trial Court Order, 2/8/00, at 1. The trial court scheduled the case for trial on April 7, 2000. On April 6, 2000, the trial court administratively delayed the case until July 21, 2000. In its award of delay damages, the trial court excluded the time period from March 7, 1999 through March 28, 2000.

¶ 28 In their cross-appeal, the Cruzes contend that the trial court improperly excluded the time period between March 7, 1999 through March 28, 2000 from its calculation of delay damages. According to the Cruzes, this delay was caused by Father's military service and, under the Act, he cannot be penalized for his military service. In the alternative, the Cruzes assert that, even if the trial court properly excluded the time that Father was in Guatemala from its calculation of delay damages, delay damages should have begun to accrue from the date of Father's return. Father returned from active military service on March 21, 1999.

¶ 29 Northeastern claims that the trial court properly excluded the time period between March 7, 1999 through March 28, 2000 from its calculation of delay damages, because the Cruzes caused the delay of trial. However, Northeastern asserts that the trial court should have excluded from its calculation of delay damages the period of time between March 28, 2000 and July 20, 2000. According to Northeastern, this delay was caused by the Cruzes' request

for a continuance of the March 27, 2000 trial date.

¶ 30 Pennsylvania Rule of Civil Procedure 238 provides, in relevant part, as follows:

> At the request of a plaintiff. in a civil action seeking monetary relief for bodily injury, ... damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, ... and shall become part of the verdict[.]

Pa.R.C.P. 238(a)(1). Damages are awarded for the period of time "from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision." Pa.R.C.P. 238(a)(2)(ii). The period of time shall exclude the period of time "during which the plaintiff caused the delay." Pa.R.C.P. 238(b)(2).

¶ 31 The first question before this Court is whether Father's active military service caused the delay of trial. If so, the Act precludes Father from being penalized by his active military service, and would support the inclusion of this time period in the calculation of delay damages. The Cruzes take this argument one step further, and insist that the Act, *per se*, requires the continued accrual of delay damages during Father's active military service.

¶ 32 There are no Pennsylvania cases that address the accrual of delay damages during a *plaintiff's* active military service. However, in *Bruder v. Carlin*, 402 Pa.Super. 152, 586 A.2d 441 (1991), this Court addressed whether the Act, *per se*, precluded the award of delay damages against a military defendant in active service. We find the reasoning in *Bruder* to be equally applicable to the instant situation.

¶ 33 In *Bruder*, this Court concluded that the Act was not intended to provide automatic relief from the normal progress of civil litigation, "but rather to provide such relief only where warranted under the circumstances." *Id.* at 444–45. This Court opined:

> [W]e find that the fact that the defendant was in the military should be cause for reduction or avoidance of delay damages only in those cases where it is demonstrated that the military service of a defendant was responsible for the delay of the trial. The delay damages award should be reduced only to account for those periods of delay where the defendant was *demonstrably prejudiced* in his ability to participate in the proceedings and that the inability to participate resulted in a delay of the trial.

*Id.* at 445 (emphasis added). We further noted that the defendant in *Bruder* was represented by counsel, and through his counsel, participated in the proceedings during the period of military service. *Id.* Accordingly, this Court remanded the matter to the trial court for a determination as to whether the defendant's military service impacted on his ability to defend or participate, or caused any other delay of the trial. *Id.* The trial court was instructed to exclude from its calculation only the period of time that the delay of trial was directly caused by the defendant's military service. *Id.*

¶ 34 The record in this case does not support Father's assertion that his military service *directly caused* the delay of the trial. Although Father requested a continuance of the March 7, 1999 trial date because of his military service, there is no indication that Father was going to testify in this matter, or that his presence was necessary during the trial. Moreover, counsel adequately represented Father's interests.

¶ 35 The trial court ultimately rescheduled the matter for trial on March 28, 2000, as a result of the Cruzes' request for a continuance of the March 7, 1999 trial date. Because the Cruzes caused the delay of the trial, and the record does not support Father's claim that his military service directly caused the delay, we affirm the trial court's exclusion of the time period between March 7, 1999 through March 28, 2000 in its calculation of delay damages.

¶ 36 Northeastern asserts that the trial court should have excluded from its calculation of delay damages the period of time between March 28, 2000 and July 20, 2000. In awarding delay damages for this time period, the trial court necessarily determined that the Cruzes were not the sole cause of the delay. The record supports this determination.

¶ 37 On February 8, 2000, the Cruzes requested a continuance of the March 27, 2000 trial date, and the trial court granted their request. However, the record also reveals that Northeastern requested a continuance of the March 27, 2000 trial date. Moreover, on April 7, 2000, the trial court administratively delayed the trial until July 21, 2000. Thus, the record supports the conclusion that the Cruzes were not the sole cause of the delay. Accordingly, the trial court did not err in including this period of time in its calculation of delay damages. For the foregoing reasons, we affirm the judgment entered by the trial court.

¶ 38 Judgment affirmed.