J-A16007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GERALD A. LACATTIVA, ADMINISTRATOR OF THE ESTATE OF JOHN M. FORD, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | No. 1237 MDA 2018 |
| HAZLETON GENERAL HOSPITAL; NORTHEASTERN PENNSYLVANIA HEALTH CARE CORPORATION INDIVIDUALLY AND/OR T/D/B/A HAZLETON GENERAL HOSPITAL; LEHIGH VALLEY HOSPITAL-HAZLETON; NORTHEASTERN PENNSYLVANIA HEALTH CARE CORPORATION INDIVIDUALLY AND/OR T/D/B/A LEHIGH VALLEY HOSPITAL-HAZLETON; LEHIGH VALLEY HEALTH NETWORK, INC., INDIVIDUALLY AND/OR T/D/B/A LEHIGH VALLEY HOSPITAL-HAZLETON; LEHIGH VALLEY HEALTH NETWORK INDIVIDUALLY AND/OR T/D/B/A LEHIGH VALLEY HOSPITAL-HAZLETON; LEHIGH VALLEY HOSPITAL-HAZLETON T/D/B/A HAZLETON GENERAL HOSPITAL; GREATER HAZLETON HEALTH ALLIANCE INDIVIDUALLY AND/OR T/D/B/A HAZLETON GENERAL HOSPITAL; HAZLETON ANESTHESIA SERVICES/SOMNIA, INC.; HAZLETON ANESTHESIA SERVICES, P.C.; ALBERT ADOMITIS; RAJAMANICKAM NATARAJAN, M.D. | : : : : : : : : : : : : : : : : : : : : : : : : : : | |

Appeal from the Judgment Entered December 28, 2018
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2016-00095

J-A16007-19

BEFORE:   LAZARUS, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 07, 2019**

Gerald A. Lacattiva, Administrator of the Estate of John M. Ford, deceased (Appellant), appeals from the judgment entered on December 28, 2018[1] in favor of Rajamanickam Natarajan, M.D. (Dr. Natarajan), Albert Adomitis, CRNA[2] (CRNA Adomitis), and Lehigh Valley Hospital-Hazleton (Hospital) (collectively, Appellees), in this medical malpractice action.  After our review, we vacate the judgment and remand for a new trial.

On January 9, 2014, Ford, who was 84 years old, underwent an outpatient elective colonoscopy in order to search for a potential cause of recently diagnosed anemia and to assess his colitis.  Ford had a noted history of atrial fibrillation, hypertension, non-insulin-dependent diabetes, chronic kidney disease, hypothyroidism and chronic obstructive pulmonary disorder (COPD).   Appellees Dr. Natarajan and CRNA Adomitis conducted a pre-anesthesia assessment.

---

[1] Appellant filed a notice of appeal on July 24, 2018, from the June 27, 2018 order denying post-trial motions. On December 24, 2018, Appellant was directed to *praecipe* the trial court prothonotary to enter judgment on the verdict and file with this Court a certified copy of the trial court docket reflecting entry of judgment in compliance with Pa.R.A.P. 301.  Appellant complied on January 2, 2018.  Accordingly, the notice of appeal will be treated as filed from the entry of judgment.  *See* Pa.R.A.P. 905(a)(5).

[2] The designation CRNA refers to a Certified Registered Nurse Anesthetist. https://www.aana.com/ (last visited 7/31/19).

- 2 -

During the colonoscopy, anesthesia was administered at approximately 10:45 a.m. and ceased at 11:13 a.m.  Following the procedure, Ford was taken to recovery where, shortly after, he became bradycardic.[3]  Doctor Natarajan immediately responded and began resuscitation.  At 11:22 a.m., Ford was intubated and transferred to ICU.  He subsequently underwent a tracheostomy.

On January 27, 2014, Ford was transferred to Kindred Facility.  There, he remained dependent on a tracheostomy collar during the day and a ventilator during the night.  On April 30, 2014, he was transferred to St. Luke's Manor.  On May 8, 2014, Ford was found unresponsive.  Ford was then transferred to Lehigh Valley Hospital-Hazleton, where he passed away.

The trial court set forth the relevant procedural history as follows:

On January 6, 2016, [Appellant] initiated the instant action by filing a complaint against multiple defendants, including [Appellees].  The Complaint alleged that John M. Ford ("Ford") received negligent care from Natarajan and Adomitis during a colonoscopy at Lehigh Valley Hospital-Hazleton[,] which caused his death from a lack of oxygen to his brain following the procedure.  Appellant filed an Amended Complaint on November 15, 2016.  Appellees [Dr.] Natarajan, [CRNA] Adomitis, and [Hospital] each filed an Answer and New Matter to the Amended Complaint on January 13, 2017, January 18, 2017, and June 16, 2017, respectively. . . .  Prior to the Trial, on December 22, 2017, Appellant filed his proposed points for charge[,] which included a request that the Court instruct the jury on Pennsylvania Suggested Standard Civil Jury Instruction 14.40 – the alteration or destruction of medical records. The Court denied Appellant's

_____

[3]  Bradycardia is characterized by a slower-than-normal heart rate. https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 (last visited 7/31/19).

request with regard to this instruction. (N.T. [Jury Trial, 1/3/18], p. 193, 194). Appellants' counsel then propounded the theory that counsel for [Hospital] should be limited to arguing the issue of whether [CRNA] Adomitis and [Dr.] Natarjan were agents of the Hospital. (N.T., p. 193). . . . Counsel for the Hospital would not stipulate that [CRNA] Adomitis and [Dr.] Natarajan were agents of [Hospital], such that the issue would remain on the verdict slip. (N.T., p. 194-196). After counsel for the Hospital explained that, while she would not ask redundant questions of witnesses, she would continue to defend Adomitis and Natarajan against claims of liability, Appellant's counsel asserted that it was unfair for those defendants to now have two lawyers. (N.T., p. 196-197). The Court ruled that [Hospital's] counsel would not be restricted to the area of agency, as she was there to protect the interests of the Hospital which were still at risk under theories of vicarious liability through both [CRNA] Adomitis and [Dr.] Natarajan. (N.T., p. 196-197). Appellant's counsel continued to argue throughout the Trial that the Hospital's counsel should only be permitted to address agency. (N.T., p. 363-365, 379, 399-400, 450-452, 569, 643-645, 846). The court overruled Appellant's objections and allowed counsel for [Hospital] to question witnesses regarding both agency and negligence. (N.T., p. 363-365, 379, 399-400, 450-452, 469, 643-645,846). At the close of the Trial, the jury rendered a verdict in favor of Appellees, finding that neither [Dr.] Natarajan nor [CRNA] Adomitis were negligent.

Trial Court Opinion, 11/27/18, at 1-5.

Appellant filed a motion for post-trial relief, which the court denied. This timely appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925. Appellant raises two issues for our review:

1. Whether the trial court erred when it refused to charge the jury on Pennsylvania Standard Civil Jury Instruction 14.40 regarding the alteration of medical records in this case?

2. Whether the trial court erred in permitting counsel for Lehigh Valley Hospital-Hazleton to actively participate at trial without limitations when each Defendant, doctor and CRNA, was individually represented and the claims against Lehigh Valley Hospital-Hazleton were limited to ostensible

agency clams for the conduct of the represented Defendants?

Appellant's Brief, at 4.

In reviewing a trial court's denial of a motion for a new trial, the standard of review for an appellate court is as follows:

[I]t is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial. . . . Thus, when analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial court abused its discretion.

*ACE Am. Ins. Co. v. Underwriters at Lloyds and Cos.*, 939 A.2d 935, 939 (Pa. Super. 2007) (citations omitted). Moreover, our review must be tailored to a well-settled, two-part analysis:

We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

*Id. See Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1121 (Pa. 2000) (new trial not warranted merely because some irregularity occurred during trial or another judge would have ruled differently; rather, harmless error doctrine applies and moving party must demonstrate prejudice).

Appellant first argues the trial court erred in denying his request that the jury charge include the entirety of Pennsylvania Suggested Standard Civil Jury Instruction 14.40 (PA-SSJI 14.40). Appellant argues inconsistencies in

Ford's medical records and alterations to the medical records that were not properly annotated established entitlement to the charge, and that the court's failure to provide the jury with that charge prejudiced him.[4]

When examining jury instructions, we must determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. *Stewart v. Motts*, 654 A.2d 535 (Pa. 1995). It is only when "the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue" that error in a charge will be found to be a sufficient basis for the award of a new trial. *Id.* at 540. The Pennsylvania Supreme Court explained that:

> a charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error. A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety.

*Ferrer v. Trustees of University of Pennsylvania*, 825 A.2d 591, 612 (Pa. 2002) (quotations and citations omitted).

Pennsylvania law makes clear that the court is bound to charge the jury "only on the law applicable to the factual parameters of a particular case and

---

[4] Appellant submitted points for charge, and timely objected to the court's failure to charge the jury accordingly. *See* N.T. Jury Trial, 1/3/18-1/12/18, at 771-72. Appellant also filed a timely post-trial motion, preserving the issue for review on appeal. *See* Plaintiff's Motion for Post-Trial Relief, 3/19/18, at 4. *See also* Pa.R.C.P. 227.1.

that it may not instruct the jury on inapplicable legal issues." **Angelo v. Diamontoni**, 871 A.2d 1276, 1279 (Pa. Super. 2005) (quoting **Cruz v. Northeastern Hosp.**, 801 A.2d 602, 611 (Pa. Super. 2002)). "Consequently, where the record [evidence fails] to satisfy the elements of a particular legal doctrine, the court may not discuss that doctrine in its charge." **Id**. Challenges to a court's jury instructions are subject to an abuse of discretion standard of review. **Butler v. Kiwi, S.A.**, 604 A.2d 270, 272 (Pa. Super. 1992).

Pennsylvania Suggested Standard Civil Jury Instruction 14.40 provides:

14.40 (CIV) ALTERATION OR DESTRUCTION OF MEDICAL RECORDS

If you find that there was an intentional alteration or destruction of medical records by the defendant[s] in this case, and that there has been no satisfactory explanation for that alteration or destruction, you may infer that the records or portions of records so altered or destroyed would have been unfavorable to the defendant[s].

**The following are satisfactory explanations for alteration or destruction of medical records: (1) a health-care provider may correct information on a patient's chart, where information has been entered erroneously, or where it is necessary to clarify entries made on the chart, provided that such corrections or additions are clearly identified as later additions by a date and time; (2) a health-care provider may add information to a patient's chart where it was not available at the time the record was first created, provided that such additions are clearly dated as later entries, and that they are made within a reasonable time**; and (3) a health-care provider may routinely dispose of medical records, after certain time limits fixed by the law have passed; in this respect, the law requires that medical records be kept for a minimum of seven years following the discharge of a patient (or, if the patient is a minor, until his or her majority, and

then for seven years or as long as the records of adults are maintained).

**Therefore, if you find that any of these three explanations applies to an intentional alteration or destruction of medical records in this case, you may not draw an inference unfavorable to the defendant[s] for that alteration or destruction. If, however, you find that none of these explanations appl[ies], you may draw such an inference.**

PA-SSJI 14.40 (emphasis added).

Here, instead of giving the requested Jury Instruction 14.40, the court instructed the jury as follows:

*You've heard evidence regarding negligent recordkeeping*; you may consider it only for the limited purpose of impeachment or credibility. *You should not consider it for substantive evidence of the Appellee's negligence, breach of standard of care, or cause of injury.*

N.T. Jury Trial, 1/3/18-1/12/18, at 771-72 (emphasis added).

At trial, Appellant presented his medical expert, John W. Schweiger, M.D., who is board certified in anesthesiology, critical care medicine and pain management.[5] N.T. Jury Trial, *supra* at 108-18. Doctor Schweiger reviewed the medical records in this case, as well as the deposition testimony of Dr. Natarajan, CRNP Adomitis, and the nurses that cared for Ford. *Id.* at 126. Doctor Schweiger testified as follows:

---

[5] Doctor Schweiger practices medicine at Tampa General Hospital in Florida, and is professor of anesthesia medicine and surgery at the University of South Florida/College of Medicine. N.T. Jury Trial, *supra* at 108. He testified that he has administered anesthesia during colonoscopies approximately 500 times, and has supervised residents and CRNAs administering anesthesia during such procedures approximately 2,000 times. *Id.* at 111.

- 8 -

So Dr. Natarajan had done a preoperative evaluation after Mr. Ford was transferred to the endoscopy suite, and it was clear that Mr. Ford did have chronic medical problems. For example, he had atrial fibrillation, which is an irregular beating of the heart, and was put on blood thinners for that. He also had non-insulin dependent diabetes mellitus, for which he was taking a pill to try to control his blood sugars. He had significant thyroid disease, which made him functionally hypothyroid, for which he had to take thyroid supplement medications to control that. He also had Stage 3B chronic kidney disease, meaning that he was still able to make his own urine, he was not dependent on dialysis, but he had significant underlying kidney issues. He also had been a smoker for more than 40[-]pack years, and was described as having some element of chronic obstructive pulmonary disease, as well. And he had a history of anemia or low blood count. . . . The record reflects that he had been treated by his primary care doctor, Dr. Fellin, and Dr. Fellin had done a very nice job controlling Mr. Ford's chronic medical problems through medication, careful monitoring and vigilance, and that his functional status was reasonably good up until the time he arrived on January 9th, 2014 at Hazleton[.] The record was clear that this was known as an ambulatory or outpatient procedure.

*Id.* at 133-34. Doctor Schweiger then detailed the four major risks of Propofol, the anesthesia drug administered to Ford prior to the procedure, which include: depressed respiration; lowered blood pressure since it is a vasodilating drug, causing blood vessels to expand; depressed myocardial function (can lower heart function by about 25%); and potential rebound anesthesia, which can cause a patient to become excessively somnolent. *Id.* at 135-36. He emphasized that the elderly and the very young are most at risk from the use of Propofol. *Id.* at 137. Doctor Schweiger explained the

- 9 -

ASA[6] classification system, which ranges from 1 to 5, and is a "risk assessment" prior to anesthesia and "serves as a way for the anesthesia team to communicate to both the surgeons and the critical care team what their assessment of the patient was before the procedure and how that may affect [his] care later on." *Id.* at 139.

Both Dr. Natarajan and CRNA Adomitis testified, as of cross, and acknowledged that there were three different preoperative/postoperative evaluations, two of which contained contradictory information and different notations. *Id.* at 255, 325. In particular, on one form Ford's ASA score was marked as both "ASA 3" and "ASA 4." On that form, both numbers 3 and 4 were circled. Classification as an ASA 3 indicates the patient has significant medical conditions that are not a constant threat to life, whereas an ASA 4 patient has significant, potentially life-threatening disease. *Id.* at 140-47.

_____

[6] The American Society of Anesthesiologists (ASA) physical status classification system was developed to offer clinicians a simple categorization of a patient's physiological status that can be helpful in predicting operative risk. The classifications range from ASA 1 to ASA 5: generally, ASA 1—a normal healthy patient, ASA 2—a patient with mild systemic disease, ASA 3—a patient with severe systemic disease that is not incapacitating, ASA 4—a patient with incapacitating severe disease that is a constant threat to life, ASA 5—a moribund patient who is not expected to survive for 24 hours with or without surgery. https://www.ncbi.nlm.nih.gov/books/NBK441940/ (last visited 7/25/19). Other factors considered to predict operative risk include: age, comorbidities, extent and duration of the operative procedure, planned anesthetic techniques, skill set of surgical team, duration of surgery, available equipment, blood products needed, medication, implants needed, and expected postoperative care.

Doctor Natarajan also acknowledged that a patient cannot be both an ASA 3

and an ASA 4:

> Q: . . . And with respect to the ASA score, Dr. Natarajan, now, we talked about that earlier, [on] ASA score you have both a 3 and a 4 circled, correct?
>
> A: That's correct.
>
> Q: And we can agree, Doctor, that Mr. Ford is not both 3 and 4, he is either a 3 or a 4; isn't that true?
>
> A: That's correct.

*Id.* at 255.   Doctor Natarajan also admitted that, despite acknowledging Ford

suffered from COPD, he "did not check [on the form] that [Ford] had COPD[.]"

*Id.* at 257.

Doctor Schweiger explained the significance of the ASA score, how it

affects the anesthetic plan, and how it affects postoperative care:

> [I]f need be, if the patient is a high risk score, for example an ASA 4 or 5, you want to communicate that to the surgeon or the GI doctor so they're aware, as well, what you have assessed the patient, that you think the patient is appropriate to undergo the procedure, and what might be needed for postoperative care. Because often the anesthesiologist involvement ends once they leave the recovery room, and now the primary doctor, be it surgeon or GI doctor, is going to continue to care for them. So the anesthesiologist needs to communicate that to them so if there are any further questions they're aware of what the anesthesiologist was thinking.

*Id.* at 148.  Doctor Schweiger stated that he "saw no demonstration anywhere

in the chart that an anesthesia plan had been formalized or written down by

Dr. Natarajan in regard to Mr. Ford." *Id.* at 149.  Additionally, Dr. Schweiger

opined that the assignment of two different ASA numbers was both unusual and inappropriate:

> Q:     [D]o you know how many copies exist of the [Hospital] records of Mr. Ford's preanesthesia evaluation?
>
> A:     It appeared that there were at least three copies that I saw of the preoperative evaluation of Mr. Ford's preoperative assessment.
>
> * * *
>
> Q:     Okay.  [C]an you tell us what ASA score was assigned for Mr. Ford?
>
> A:     So in this particular case, Dr. Natarajan has circled that Mr. Ford is both an ASA 3 and an ASA 4.  In terms of the paperwork, there's circles around both.
>
> Q:     Okay.  And is it unusual for you to see an ASA score – two different scores on the ASA record?
>
> A:     Yes.  *It's highly unusual.  In fact, it's not the way that the assessment is to be done.  After the anesthesiologist does a history and physical exam and reviews the medical record, they are to assign one number, not two.  So I do not teach nor have I seen that a patient would be assigned two ASA scores*.

*Id.* at 139-141 (emphasis added).  Doctor Schweiger also stated that the copies of the report did not match; in other words, they were not photocopies or carbon copy forms because "[t]he circles around 4, ASA 4, are different, meaning that they were not done at the same time." *Id.* at 142.

Appellant argues these discrepancies are suggestive of alteration and that neither Dr. Natarajan nor CRNA Adomitis explained why there were multiple copies of the same medical records with notations.  Appellant contends, therefore, that he was entitled to have the jury charged accordingly.

Moreover, the trial court recognized there were substantive differences between the various copies of the medical records and that different copies of the same medical record had different notations without proper indication of when and by whom the notations were made. *See* Trial Court Opinion, *supra* at 38-39. A difference in an ASA score of 3 or 4 could alter the postoperative care a patient receives or even suggest that the elective surgery may be an unnecessary risk at that time. Notably, Dr. Natarajan acknowledged that he did not discuss a postoperative plan, preoperatively, with CRNA Adomitis, and also acknowledged that the postoperative period "is the most dangerous period for a patient, an elderly patient like Mr. Ford, who is an ASA 4[.]" N.T. Jury Trial, *supra* at 283-84.

CRNA Adomitis testified, "Initially [Ford] was an ASA 3 when I first saw him earlier in the day. And then prior to the procedure Dr. Natarajan made him an ASA 4." *Id.* at 313. He also testified that he did not circle either the 3 or the 4 ASA scores; he did not do anything on the preoperative report other than acknowledge it with his signature and the date and time. *Id.* at 321-22. On the anesthesia record report, ASA 3 and ASA 4 are both circled, and below that is the notation "ASA IV," in Roman Numerals, which CRNA Adomitis acknowledged was his handwriting." *Id.* at 325. Further, and somewhat puzzlingly, there is another copy of that form, also with both ASA 3 and ASA 4 circled, and also with the notation "ASA IV," which CRNA Adomitis testified was *not* his handwriting. *Id.* at 323. The two forms are identical (photocopies or carbon copies) in all respects, except with respect to the notations in the

ASA section. Finally, with respect to these two documents, CRNA Adomitis testified as follows:

> Q: And so as I understand it, you have no explanation as to why these documents in these areas are different.
>
> A: None.
>
> Q: You have no explanation, sir?
>
> A: No explanation.

*Id.* at 326.

Doctor Schweiger, after reviewing the testimony of both Dr. Natarajan and CRNA Adomitis, did not find an adequate explanation for the discrepancies. Moreover, and more significantly, our review indicates that neither Dr. Natarajan nor CRNA Adomitis adequately clarified the discrepancies.

Unexplained alteration of evidence by a litigant may give rise to an adverse inference. *See* PA-SSJI 14.40. The court's authority to provide the jury instruction derives from the Medical Care Availability and Reduction of Error Act (MCARE Act). The Subcommittee Note to Jury Instruction 14.40 refers to section 511 of the MCARE Act, and states, in relevant part:

> The [MCARE Act], at section 511, has specific provisions regarding the intentional alteration or destruction of medical records. The instruction above tracks the pertinent provisions of section 511. Thus, the general authority to permit the jury to draw the adverse inference is set forth in section 511(C), which provides, "[i]n any medical professional liability action in which the claimant proves . . . that there has been an intentional alteration or destruction of medical records, the court in its discretion may instruct the jury to consider whether such intentional alteration or destruction constitutes an adverse inference." With respect to the three

"satisfactory explanations" identified in this instruction, any one of which, if applicable, will prohibit the drawing of the adverse inference, these are listed in sections 511(B)(1) through 511(B)(3) of the act, as conduct that "shall not be considered unprofessional." *Id*. at § 511(B).

Pa. SSJI (CIV), 14.40, December 2012.[7]

Appellant established the evidentiary basis for the instruction. The instruction the court gave prohibited the jury from considering "negligent recordkeeping" as substantive evidence of negligence or breach of the standard of care, or cause of injury; the jury was allowed to consider it for impeachment purposes only. Although we acknowledge the fact that an alteration or destruction of medical records instruction does not *direct* that an adverse inference be found, here the jury was precluded from making that permissible inference. In light of the facts in question, the critical nature of the evidence in question, and the lack of adequate explanation of the discrepancies, we find the court's refusal to give the requested instruction was

_____

[7] Under section 1303.511 of the MCARE Act, effective to cases pending as of May 19, 2002, the patient's chart must be created simultaneously with the rendering of treatment or as soon as practically possible. Any subsequent additions must clearly identify the time and date of their entry. If a provider violates this provision, his medical license may be suspended or revoked. If a plaintiff can show an intentional alteration or destruction of records, a jury may be instructed that such alteration or destruction allows a negative interference. However, in *Bugieda v. HUP*, 2007 Phila. Ct. Com. Pl. LEXIS 36 (Phila. C.P. 2007), a Common Pleas Court judge held that this provision was not exclusive and that an adverse inference instruction may be provided against a medical provider pursuant to pre-existing common law where the plaintiff need only show that the defendant lacked "satisfactory explanation" of why it failed to produce the missing document. *Bugieda* was affirmed by this Court in 2008. *See Bugieda v. HUP*, 3270 EDA 2006 (Pa. Super. filed January 15, 2008) (unpublished memorandum).

prejudicial. We conclude, therefore, that the trial court abused its discretion in failing to give the requested Jury Instruction 14.40.

In his second issue, Appellant claims that the court erred in permitting counsel for Hospital to participate at trial when all named defendants were represented by counsel and the claims against Hospital were limited to vicarious liability. Appellant argues that the "direct negligence claims were against Defendants Dr. Natarajan and CRNA Adomitis, both of whom had [his] own attorney[,]" and therefore the court's failure to limit Hospital's involvement was an abuse of discretion. We disagree.

In all civil litigation, the trial judge has broad power and discretion to control the conduct of the trial. *DeFulvio v. Holst*, 362 A.2d 1092 (Pa. Super. 1976). It is within the trial court's discretion to regulate the trial proceeding, and as long as there is no clear abuse of discretion and no violation of due process, we will not reverse the court's exercise of discretion. *See Speer v. Barry*, 503 A.2d 409, 411 (Pa. Super. 1985).

Pennsylvania Rule of Civil Procedure 223 provides:

**Rule 223. Conduct of the Trial. Generally**

Subject to the requirements of due process of law and of the constitutional rights of the parties, the court may make and enforce rules and orders covering any of the following matters, *inter alia*: . . . (2) *Limiting the number of attorneys representing the same party or the same group of parties, who may actively participate in the trial of the case or may examine or cross-examine a witness or witnesses*.

Pa.R.C.P. 223(2) (emphasis added).

Appellant cites to **Burish v. Digon**, 206 A.2d 497 (Pa. 1965), and **Deeds v. University of Pennsylvania Medical Center**, 110 A.2d 1009 (Pa. Super. 2015), to support this argument. Neither case is on point.

In **Burish**, a consolidated motor vehicle collision case, Burish was represented by two different attorneys—one in his capacity as plaintiff, and another in his role as defendant. After the close of evidence, defendant Digon's attorney argued her contentions, both as plaintiff and as defendant, to the jury. The attorney who represented Burish as plaintiff then argued his side of the case fully to the jury. The attorney who represented Burish as defendant then requested permission also to argue to the jury. The court denied the request. On appeal, Burish argued this was error and required a new trial. The Pennsylvania Supreme Court disagreed, citing to Rule 223, and stating:

> Under Rule 223 of the Pennsylvania Rules of Civil Procedure, . . . local courts are empowered to make and enforce rules regulating the number and length of addresses to the jury. . . . Further, it has long been established that the addresses of counsel to the jury are especially subject to the regulatory powers of the trial judge. So long as no clear abuse of discretion exists or rights of due process are violated, an appellate court should not interfere. Under the circumstances presented, none such appear.

**Burish**, 206 A.2d at 499 (citations omitted). The Court determined that the trial court properly limited the two attorneys with similar interests (one of which was financial coverage), to a single closing argument. **Burish**, 206 A.2d at 499. As recognized by the trial court, here, unlike in **Burish**, Hospital was a distinct entity and named defendant, separate from the individually

- 17 -

named defendants. In addition to the theory that there was no negligence, the Hospital pursued the theory that there was no agency. The parties' interests, therefore, were not necessarily the same.

The facts in **Deeds** are also distinguishable. There, the issue of agency was admitted, and the facts and claims pleaded against defendant hospital and defendant trustees were identical. Moreover, defendant hospital and defendant trustees shared expert witnesses. Essentially, they were members of "the same group of parties," and the "matter of coverage alone did not require counsel for the [defendant t]rustees' active participation." 110 A.3d at 1016, citing Pa.R.C.P. 223(2) and **Burish**, **supra**. Further, we found plaintiff was prejudiced where "counsel for the [defendant t]rustees transgressed the collateral source rule on at least three occasions," transgressions which formed the basis for a new trial in that case. **Deeds**, 110 A.3d at 1017. Defendant trustees' questions, which involved improper inquiries into plaintiff's existing financial coverage for her medical needs, "went well beyond the scope of [plaintiff's] allegations of negligence against [defendant doctor.]. **Id.** We held, therefore, that the trial court abused its discretion in permitting counsel for defendant hospital and defendant trustees effectively to "tag team" plaintiff at trial while representing the *same* interest. **Id.**

Here, Hospital was a named defendant under the theory of vicarious liability; in its defense, the Hospital sought to prove (a) that Dr. Natarajan and CRNA Adomitis were not its agents, and (b) that Dr. Natarajan and CRNA

- 18 -

Adomitis were not negligent. Hospital was a distinct defendant, listed on the verdict slip, with interests not necessarily the same as the other defendants. Hospital, therefore, was entitled to its own representation. Appellant has failed to establish that the trial court committed a clear abuse of discretion in refusing his request to limit Hospital's counsel's participation at trial. ***Speer***, ***supra***.

Judgment vacated. Case remanded for new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2019